## CALIFORNIA *v.* HODARI D.

No. 89–1632.   Argued January 14, 1991—Decided April 23, 1991

SCALIA, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and WHITE, BLACKMUN, O'CONNOR, KENNEDY, and SOUTER, JJ., joined. STEVENS, J., filed a dissenting opinion, in which MARSHALL, J., joined, *post*, p. 629.

*Ronald E. Niver,* Deputy Attorney General of California, argued the cause for petitioner. With him on the briefs were *John K. Van de Kamp,* Attorney General, *Richard B. Iglehart,* Chief Assistant Attorney General, *John H. Sugiyama,* Senior Assistant Attorney General, and *Clifford K. Thompson, Jr.,* and *Morris Beatus,* Deputy Attorneys General.

*Clifford M. Sloan* argued the cause for the United States as *amicus curiae* urging reversal. On the brief were *Solicitor General Starr, Assistant Attorney General Mueller, Deputy Solicitor General Bryson,* and *Paul J. Larkin, Jr.*

*James L. Lozenski,* by appointment of the Court, 498 U. S. 935, argued the cause for respondent. With him on the brief was *J. Bradley O'Connell.**

JUSTICE SCALIA delivered the opinion of the Court.

Late one evening in April 1988, Officers Brian McColgin and Jerry Pertoso were on patrol in a high-crime area of Oakland, California. They were dressed in street clothes but wearing jackets with "Police" embossed on both front and back. Their unmarked car proceeded west on Foothill Boulevard, and turned south onto 63rd Avenue. As they rounded the corner, they saw four or five youths huddled around a small red car parked at the curb. When the youths

---

*Briefs of *amici curiae* urging reversal were filed for the Criminal Justice Legal Foundation by *Kent S. Scheidegger* and *Charles L. Hobson;* and for the Wayne County Prosecuting Attorney by *John D. O'Hair, pro se,* and *Timothy A. Baughman.*

Briefs of *amici curiae* urging affirmance were filed for the California Attorneys for Criminal Justice by *Paul L. Gabbert;* and for the National Association of Criminal Defense Lawyers by *Paul Morris.*

Briefs of *amici curiae* were filed for the Appellate Committee of the California District Attorneys Association by *Ira Reiner* and *Harry B. Sondheim;* and for *Marvin Cahn, pro se.*

saw the officers' car approaching they apparently panicked, and took flight. The respondent here, Hodari D., and one companion ran west through an alley; the others fled south. The red car also headed south, at a high rate of speed.

The officers were suspicious and gave chase. McColgin remained in the car and continued south on 63rd Avenue; Pertoso left the car, ran back north along 63rd, then west on Foothill Boulevard, and turned south on 62nd Avenue. Hodari, meanwhile, emerged from the alley onto 62nd and ran north. Looking behind as he ran, he did not turn and see Pertoso until the officer was almost upon him, whereupon he tossed away what appeared to be a small rock. A moment later, Pertoso tackled Hodari, handcuffed him, and radioed for assistance. Hodari was found to be carrying $130 in cash and a pager; and the rock he had discarded was found to be crack cocaine.

In the juvenile proceeding brought against him, Hodari moved to suppress the evidence relating to the cocaine. The court denied the motion without opinion. The California Court of Appeal reversed, holding that Hodari had been "seized" when he saw Officer Pertoso running towards him, that this seizure was unreasonable under the Fourth Amendment, and that the evidence of cocaine had to be suppressed as the fruit of that illegal seizure. The California Supreme Court denied the State's application for review. We granted certiorari. 498 U. S. 807 (1990).

As this case comes to us, the only issue presented is whether, at the time he dropped the drugs, Hodari had been "seized" within the meaning of the Fourth Amendment.[1] If

---

[1] California conceded below that Officer Pertoso did not have the "reasonable suspicion" required to justify stopping Hodari, see *Terry* v. *Ohio*, 392 U. S. 1 (1968). That it would be unreasonable to stop, for brief inquiry, young men who scatter in panic upon the mere sighting of the police is not self-evident, and arguably contradicts proverbial common sense. See Proverbs 28:1 ("The wicked flee when no man pursueth"). We do not decide that point here, but rely entirely upon the State's concession.

so, respondent argues, the drugs were the fruit of that seizure and the evidence concerning them was properly excluded. If not, the drugs were abandoned by Hodari and lawfully recovered by the police, and the evidence should have been admitted. (In addition, of course, Pertoso's seeing the rock of cocaine, at least if he recognized it as such, would provide reasonable suspicion for the unquestioned seizure that occurred when he tackled Hodari. Cf. *Rios* v. *United States*, 364 U. S. 253 (1960).)

We have long understood that the Fourth Amendment's protection against "unreasonable . . . seizures" includes seizure of the person, see *Henry* v. *United States*, 361 U. S. 98, 100 (1959). From the time of the founding to the present, the word "seizure" has meant a "taking possession," 2 N. Webster, An American Dictionary of the English Language 67 (1828); 2 J. Bouvier, A Law Dictionary 510 (6th ed. 1856); Webster's Third New International Dictionary 2057 (1981). For most purposes at common law, the word connoted not merely grasping, or applying physical force to, the animate or inanimate object in question, but actually bringing it within physical control. A ship still fleeing, even though under attack, would not be considered to have been seized as a war prize. Cf. *The Josefa Segunda*, 10 Wheat. 312, 325–326 (1825). A res capable of manual delivery was not seized until "tak[en] into custody." *Pelham* v. *Rose*, 9 Wall. 103, 106 (1870). To constitute an arrest, however— the quintessential "seizure of the person" under our Fourth Amendment jurisprudence—the mere grasping or application of physical force with lawful authority, whether or not it succeeded in subduing the arrestee, was sufficient. See, *e. g.*, *Whitehead* v. *Keyes*, 85 Mass. 495, 501 (1862) ("[A]n officer effects an arrest of a person whom he has authority to arrest, by laying his hand on him for the purpose of arresting him, though he may not succeed in stopping and holding him"); 1

Restatement of Torts § 41, Comment *h* (1934). As one commentator has described it:

> "There can be constructive detention, which will constitute an arrest, although the party is never actually brought within the physical control of the party making an arrest. This is accomplished by merely touching, however slightly, the body of the accused, by the party making the arrest and for that purpose, although he does not succeed in stopping or holding him even for an instant; as where the bailiff had tried to arrest one who fought him off by a fork, the court said, 'If the bailiff had touched him, that had been an arrest . . . .'" A. Cornelius, Search and Seizure 163–164 (2d ed. 1930) (footnote omitted).

To say that an arrest is effected by the slightest application of physical force, despite the arrestee's escape, is not to say that for Fourth Amendment purposes there is a *continuing* arrest during the period of fugitivity. If, for example, Pertoso had laid his hands upon Hodari to arrest him, but Hodari had broken away and had *then* cast away the cocaine, it would hardly be realistic to say that that disclosure had been made during the course of an arrest. Cf. *Thompson* v. *Whitman*, 18 Wall. 457, 471 (1874) ("A seizure is a single act, and not a continuous fact"). The present case, however, is even one step further removed. It does not involve the application of any physical force; Hodari was untouched by Officer Pertoso at the time he discarded the cocaine. His defense relies instead upon the proposition that a seizure occurs "when the officer, by means of physical force *or show of authority*, has in some way restrained the liberty of a citizen." *Terry* v. *Ohio*, 392 U. S. 1, 19, n. 16 (1968) (emphasis added). Hodari contends (and we accept as true for purposes of this decision) that Pertoso's pursuit qualified as a "show of au-

thority" calling upon Hodari to halt. The narrow question before us is whether, with respect to a show of authority as with respect to application of physical force, a seizure occurs even though the subject does not yield. We hold that it does not.

The language of the Fourth Amendment, of course, cannot sustain respondent's contention. The word "seizure" readily bears the meaning of a laying on of hands or application of physical force to restrain movement, even when it is ultimately unsuccessful. ("She seized the purse-snatcher, but he broke out of her grasp.") It does not remotely apply, however, to the prospect of a policeman yelling "Stop, in the name of the law!" at a fleeing form that continues to flee. That is no seizure.[2] Nor can the result respondent wishes to achieve be produced—indirectly, as it were—by suggesting that Pertoso's uncomplied-with show of authority was a common-law arrest, and then appealing to the principle that all common-law arrests are seizures. An arrest requires *either* physical force (as described above) *or*, where that is absent, *submission* to the assertion of authority.

> "Mere words will not constitute an arrest, while, on the other hand, no actual, physical touching is essential. The apparent inconsistency in the two parts of this statement is explained by the fact that an assertion of authority and purpose to arrest followed by submission of the arrestee constitutes an arrest. There can be no arrest

---

[2] For this simple reason—which involves neither "logic-chopping," *post*, at 646, nor any arcane knowledge of legal history—it is irrelevant that English law proscribed "an unlawful *attempt* to take a presumptively innocent person into custody." *Post*, at 631. We have consulted the common law to explain the meaning of seizure—and, contrary to the dissent's portrayal, to expand rather than contract that meaning (since one would not normally think that the mere touching of a person would suffice). But neither usage nor common-law tradition makes an *attempted* seizure a seizure. The common law may have made an attempted seizure unlawful in certain circumstances; but it made many things unlawful, very few of which were elevated to constitutional proscriptions.

without either touching or submission." Perkins, The Law of Arrest, 25 Iowa L. Rev. 201, 206 (1940) (footnotes omitted).

We do not think it desirable, even as a policy matter, to stretch the Fourth Amendment beyond its words and beyond the meaning of arrest, as respondent urges.[3] Street pursuits always place the public at some risk, and compliance with police orders to stop should therefore be encouraged. Only a few of those orders, we must presume, will be without adequate basis, and since the addressee has no ready means of identifying the deficient ones it almost invariably is the responsible course to comply. Unlawful orders will not be deterred, moreover, by sanctioning through the exclusionary rule those of them that are *not* obeyed. Since policemen do not command "Stop!" expecting to be ignored, or give chase hoping to be outrun, it fully suffices to apply the deterrent to their genuine, successful seizures.

Respondent contends that his position is sustained by the so-called *Mendenhall* test, formulated by Justice Stewart's opinion in *United States* v. *Mendenhall*, 446 U. S. 544, 554 (1980), and adopted by the Court in later cases, see *Michigan* v. *Chesternut*, 486 U. S. 567, 573 (1988); *INS* v. *Delgado*, 466 U. S. 210, 215 (1984): "[A] person has been 'seized' within the

---

[3] Nor have we ever done so. The dissent is wrong in saying that *Terry* v. *Ohio*, 392 U. S. 1 (1968), "broadened the range of encounters . . . encompassed within the term 'seizure,'" *post*, at 635. *Terry* unquestionably involved conduct that would constitute a common-law seizure; its novelty (if any) was in expanding the acceptable *justification* for such a seizure, beyond probable cause. The dissent is correct that *Katz* v. *United States*, 389 U. S. 347 (1967), "unequivocally reject[s] the notion that the common law of arrest defines the limits of the term 'seizure' in the Fourth Amendment," *post*, at 637. But we do not assert that it defines the limits of the term "seizure"; only that it defines the limits of a *seizure of the person*. What *Katz* stands for is the proposition that items which could not be subject to seizure at common law (*e. g.*, telephone conversations) can be seized under the Fourth Amendment. That is quite different from saying that what constitutes an arrest (a seizure of the person) has changed.

meaning of the Fourth Amendment only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." 446 U. S., at 554. See also *Florida* v. *Royer*, 460 U. S. 491, 502 (1983) (opinion of WHITE, J.). In seeking to rely upon that test here, respondent fails to read it carefully. It says that a person has been seized "only if," not that he has been seized "whenever"; it states a *necessary*, but not a *sufficient*, condition for seizure—or, more precisely, for seizure effected through a "show of authority." *Mendenhall* establishes that the test for existence of a "show of authority" is an objective one: not whether the citizen perceived that he was being ordered to restrict his movement, but whether the officer's words and actions would have conveyed that to a reasonable person. Application of this objective test was the basis for our decision in the other case principally relied upon by respondent, *Chesternut, supra*, where we concluded that the police cruiser's slow following of the defendant did not convey the message that he was not free to disregard the police and go about his business. We did not address in *Chesternut*, however, the question whether, if the *Mendenhall* test was met—if the message that the defendant was not free to leave *had* been conveyed—a Fourth Amendment seizure would have occurred. See 486 U. S., at 577 (KENNEDY, J., concurring).

Quite relevant to the present case, however, was our decision in *Brower* v. *Inyo County*, 489 U. S. 593, 596 (1989). In that case, police cars with flashing lights had chased the decedent for 20 miles—surely an adequate "show of authority"—but he did not stop until his fatal crash into a police-erected blockade. The issue was whether his death could be held to be the consequence of an unreasonable seizure in violation of the Fourth Amendment. We did not even consider the possibility that a seizure could have occurred during the course of the chase because, as we explained, that "show of authority" did not produce his stop. *Id.*, at 597. And we dis-

cussed, *ibid.*, an opinion of Justice Holmes, involving a situation not much different from the present case, where revenue agents had picked up containers dropped by moonshiners whom they were pursuing without adequate warrant. The containers were not excluded as the product of an unlawful seizure because "[t]he defendant's own acts, and those of his associates, disclosed the jug, the jar and the bottle—and there was no seizure in the sense of the law when the officers examined the contents of each after they had been abandoned." *Hester* v. *United States*, 265 U. S. 57, 58 (1924). The same is true here.

In sum, assuming that Pertoso's pursuit in the present case constituted a "show of authority" enjoining Hodari to halt, since Hodari did not comply with that injunction he was not seized until he was tackled. The cocaine abandoned while he was running was in this case not the fruit of a seizure, and his motion to exclude evidence of it was properly denied. We reverse the decision of the California Court of Appeal, and remand for further proceedings not inconsistent with this opinion.

*It is so ordered.*

JUSTICE STEVENS, with whom JUSTICE MARSHALL joins, dissenting.

The Court's narrow construction of the word "seizure" represents a significant, and in my view, unfortunate, departure from prior case law construing the Fourth Amendment.[1] Almost a quarter of a century ago, in two landmark cases — one broadening the protection of individual privacy,[2] and the other broadening the powers of law enforcement officers[3] — we rejected the method of Fourth Amendment analysis that

---

[1] The Fourth Amendment to the Constitution protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures . . . ."

[2] *Katz* v. *United States*, 389 U. S. 347 (1967).

[3] *Terry* v. *Ohio*, 392 U. S. 1 (1968).

today's majority endorses. In particular, the Court now adopts a definition of "seizure" that is unfaithful to a long line of Fourth Amendment cases. Even if the Court were defining seizure for the first time, which it is not, the definition that it chooses today is profoundly unwise. In its decision, the Court assumes, without acknowledging, that a police officer may now fire his weapon at an innocent citizen and not implicate the Fourth Amendment — as long as he misses his target.

For the purposes of decision, the following propositions are not in dispute. First, when Officer Pertoso began his pursuit of respondent,[4] the officer did not have a lawful basis for either stopping or arresting respondent. See App. 138–140; *ante*, at 623, n. 1. Second, the officer's chase amounted to a "show of authority" as soon as respondent saw the officer nearly upon him. See *ante*, at 625–626, 629. Third, the act of discarding the rock of cocaine was the direct consequence of the show of authority. See Pet. for Cert. 48–49, 52. Fourth, as the Court correctly demonstrates, no common-law arrest occurred until the officer tackled respondent. See *ante*, at 624–625. Thus, the Court is quite right in concluding that the abandonment of the rock was not the fruit of a common-law arrest.

It is equally clear, however, that if the officer had succeeded in touching respondent before he dropped the rock—

---

[4] The Court's gratuitous quotation from Proverbs 28:1, see *ante*, at 623, n. 1, mistakenly assumes that innocent residents have no reason to fear the sudden approach of strangers. We have previously considered, and rejected, this ivory-towered analysis of the real world for it fails to describe the experience of many residents, particularly if they are members of a minority. See generally Johnson, Race and the Decision To Detain a Suspect, 93 Yale L. J. 214 (1983). It has long been "a matter of common knowledge that men who are entirely innocent do sometimes fly from the scene of a crime through fear of being apprehended as the guilty parties, or from an unwillingness to appear as witnesses. Nor is it true as an accepted axiom of criminal law that 'the wicked flee when no man pursueth, but the righteous are as bold as a lion.'" *Alberty* v. *United States*, 162 U. S. 499, 511 (1896).

even if he did not subdue him—an arrest would have occurred.[5] See *ante,* at 624–625, 626. In that event (assuming the touching precipitated the abandonment), the evidence would have been the fruit of an unlawful common-law arrest. The distinction between the actual case and the hypothetical case is the same as the distinction between the common-law torts of assault and battery—a touching converts the former into the latter.[6] Although the distinction between assault and battery was important for pleading purposes, see 2 J. Chitty, Pleading *372–*376, the distinction should not take on constitutional dimensions. The Court mistakenly allows this common-law distinction to define its interpretation of the Fourth Amendment.

At the same time, the Court fails to recognize the existence of another, more telling, common-law distinction—the distinction between an arrest and an attempted arrest. As the Court teaches us, the distinction between battery and assault was critical to a correct understanding of the common law of arrest. See *ante,* at 626 ("An arrest requires *either* physical force . . . *or,* where that is absent, *submission* to the assertion of authority"). However, the facts of this case do not describe an actual arrest, but rather an unlawful *attempt* to take a presumptively innocent person into custody. Such an

---

[5] "[I]f the officer pronounces words of arrest without an actual touching and the other immediately runs away, there is no escape (in the technical sense) because there was no arrest. It would be otherwise had the officer touched the arrestee for the purpose of apprehending him, because touching for the manifested purpose of arrest by one having lawful authority completes the apprehension, 'although he does not succeed in stopping or holding him even for an instant.'" Perkins, The Law of Arrest, 25 Iowa L. Rev. 201, 206 (1940) (footnotes omitted).

[6] "One who undertakes to make an arrest without lawful authority, or who attempts to do so in an unlawful manner, is guilty of an assault if the other is ordered to submit to the asserted authority, is guilty of battery if he lays hands on the other for this unlawful purpose . . . ." *Id.,* at 263 (footnotes omitted).

attempt was unlawful at common law.[7]   Thus, if the Court wants to define the scope of the Fourth Amendment based on the common law, it should look, not to the common law of arrest, but to the common law of attempted arrest, according to the facts of this case.

The first question, then, is whether the common law should define the scope of the outer boundaries of the constitutional protection against unreasonable seizures.   Even if, contrary to settled precedent, traditional common-law analysis were controlling, it would still be necessary to decide whether the unlawful attempt to make an arrest should be considered a seizure within the meaning of the Fourth Amendment, and whether the exclusionary rule should apply to unlawful attempts.

I

The Court today takes a narrow view of "seizure," which is at odds with the broader view adopted by this Court almost 25 years ago.   In *Katz* v. *United States*, 389 U. S. 347 (1967), the Court considered whether electronic surveillance conducted "without any trespass and without the seizure of any material object fell outside the ambit of the Constitution." *Id.*, at 353.   Over Justice Black's powerful dissent, we rejected that "narrow view" of the Fourth Amendment and held that electronic eavesdropping is a "search and seizure" within the meaning of the Amendment.   *Id.*, at 353–354. We thus endorsed the position expounded by two of the dissenting Justices in *Olmstead* v. *United States*, 277 U. S. 438 (1928):

---

[7] "[E]ven without touching the other, the officer may subject himself to liability if he undertakes to make an arrest without being privileged by law to do so.[3]

"[3] For example, an officer might be guilty of an assault because of an attempted arrest, without privilege, even if he did not succeed in touching the other.   Furthermore, if the other submitted to such an arrest without physical contact, the officer is liable for false imprisonment.   Gold v. Bissell, 1 Wend. 210 (N. Y. Sup. Ct. 1828)." *Id.*, at 201.

"Time and again, this Court in giving effect to the principle underlying the Fourth Amendment, has refused to place an unduly literal construction upon it." *Id.*, at 476 (Brandeis, J., dissenting).

"The direct operation or literal meaning of the words used do not measure the purpose or scope of its provisions. Under the principles established and applied by this Court, the Fourth Amendment safeguards against all evils that are like and equivalent to those embraced within the ordinary meaning of its words." *Id.*, at 488 (Butler, J., dissenting).

Writing for the Court in *Katz*, Justice Stewart explained:

"Thus, although a closely divided Court supposed in *Olmstead* that surveillance without any trespass and without the seizure of any material object fell outside the ambit of the Constitution, we have since departed from the narrow view on which that decision rested. Indeed, we have expressly held that the Fourth Amendment governs not only the seizure of tangible items, but extends as well to the recording of oral statements, overheard without any 'technical trespass under . . . local property law.' *Silverman* v. *United States*, 365 U. S. 505, 511. Once this much is acknowledged, and once it is recognized that the Fourth Amendment protects people—and not simply 'areas'—against unreasonable searches and seizures, it becomes clear that the reach of that Amendment cannot turn upon the presence or absence of a physical intrusion into any given enclosure.

"We conclude that the underpinnings of *Olmstead* and *Goldman* have been so eroded by our subsequent decisions that the 'trespass' doctrine there enunciated can no longer be regarded as controlling. The Government's activities in electronically listening to and recording the petitioner's words violated the privacy upon which he justifiably relied while using the telephone

booth and thus constituted a 'search and seizure' within the meaning of the Fourth Amendment. The fact that the electronic device employed to achieve that end did not happen to penetrate the wall of the booth can have no constitutional significance.

"The question remaining for decision, then, is whether the search and seizure conducted in this case complied with constitutional standards." 389 U. S., at 353–354.

Significantly, in the *Katz* opinion, the Court repeatedly used the word "seizure" to describe the process of recording sounds that could not possibly have been the subject of a common-law seizure. See *id.*, at 356, 357.

Justice Black's reasoning, which was rejected by the Court in 1967, is remarkably similar to the reasoning adopted by the Court today. After criticizing "language-stretching judges," *id.*, at 366, Justice Black wrote:

> "I do not deny that common sense requires and that this Court often has said that the Bill of Rights' safeguards should be given a liberal construction. This principle, however, does not justify construing the search and seizure amendment as applying to eavesdropping or the 'seizure' of conversations." *Id.*, at 366–367.
>
> "Since I see no way in which the words of the Fourth Amendment can be construed to apply to eavesdropping, that closes the matter for me. In interpreting the Bill of Rights, I willingly go as far as a liberal construction of the language takes me, but I simply cannot in good conscience give a meaning to words which they have never before been thought to have and which they certainly do not have in common ordinary usage. I will not distort the words of the Amendment in order to 'keep the Constitution up to date' or 'to bring it into harmony with the times.' It was never meant that this Court have such power, which in effect would make us a continuously functioning constitutional convention." *Id.*, at 373.

The expansive construction of the word "seizure" in the *Katz* case provided an appropriate predicate for the Court's holding in *Terry* v. *Ohio*, 392 U. S. 1 (1968), the following year.[8] Prior to *Terry*, the Fourth Amendment proscribed any seizure of the person that was not supported by the same probable-cause showing that would justify a custodial arrest.[9] See *Dunaway* v. *New York*, 442 U. S. 200, 207–209 (1979). Given the fact that street encounters between citizens and police officers "are incredibly rich in diversity," *Terry*, 392 U. S., at 13, the Court recognized the need for flexibility and held that "reasonable" suspicion—a quantum of proof less demanding than probable cause—was adequate to justify a stop for investigatory purposes. *Id.*, at 21–22. As a corollary to the lesser justification for the stop, the Court necessarily concluded that the word "seizure" in the Fourth Amendment encompasses official restraints on individual freedom that fall short of a common-law arrest. Thus, *Terry* broadened the range of encounters between the police and the citizen encompassed within the term "seizure," while at the same time, lowering the standard of proof necessary to justify a "stop" in the newly expanded category of sei-

---

[8] "We have recently held that 'the Fourth Amendment protects people, not places,' *Katz* v. *United States*, 389 U. S. 347, 351 (1967), and wherever an individual may harbor a reasonable 'expectation of privacy,' *id.*, at 361 (MR. JUSTICE HARLAN, concurring), he is entitled to be free from unreasonable governmental intrusion. Of course, the specific content and incidents of this right must be shaped by the context in which it is asserted. For 'what the Constitution forbids is not all searches and seizures, but unreasonable searches and seizures.' *Elkins* v. *United States*, 364 U. S. 206, 222 (1960)." *Terry* v. *Ohio*, 392 U. S., at 9.

[9] *Hester* v. *United States*, 265 U. S. 57 (1924), the case on which the majority largely relies, was decided over 40 years before *Terry*. In that case, the defendant did not even argue that there was a seizure of his person. The Court's holding in *Hester* that the abandoned moonshine whiskey had not been seized simply did not address the question whether it would have been the fruit of a constitutional violation if there had been a seizure of the person before the whiskey was abandoned.

zures now covered by the Fourth Amendment.[10]   The Court explained:

> "Our first task is to establish at what point in this encounter the Fourth Amendment becomes relevant. That is, we must decide whether and when Officer McFadden 'seized' Terry and whether and when he conducted a 'search.'   There is some suggestion in the use of such terms as 'stop' and 'frisk' that such police conduct is outside the purview of the Fourth Amendment because neither action rises to the level of a 'search' or 'seizure' within the meaning of the Constitution.   We emphatically reject this notion.   It is quite plain that the Fourth Amendment governs 'seizures' of the person which do not eventuate in a trip to the station house and prosecution for crime—'arrests' in traditional terminology.   It must be recognized that whenever a police officer accosts an individual and restrains his freedom to walk away, he has 'seized' that person."   *Id.*, at 16 (footnote omitted).

> "The distinctions of classical 'stop-and-frisk' theory thus serve to divert attention from the central inquiry under the Fourth Amendment—the reasonableness in all the circumstances of the particular governmental invasion of a citizen's personal security.   'Search' and 'seizure' are not talismans.   We therefore reject the notions that the Fourth Amendment does not come into play at all as a limitation upon police conduct if the officers stop short of something called a 'technical arrest' or a 'full-blown search.'"   *Id.*, at 19.

---

[10] The Court applied this principle in *Brown* v. *Texas,* 443 U. S. 47 (1979):

"We have recognized that in some circumstances an officer may detain a suspect briefly for questioning, although he does not have 'probable cause' to believe that the suspect is involved in criminal activity, as is required for a traditional arrest.   However, we have required the officers to have a reasonable suspicion, based on objective facts, that the individual is involved in criminal activity."   *Id.*, at 51 (citations omitted).

The decisions in *Katz* and *Terry* unequivocally reject the notion that the common law of arrest defines the limits of the term "seizure" in the Fourth Amendment. In *Katz*, the Court abandoned the narrow view that would have limited a seizure to a material object, and, instead, held that the Fourth Amendment extended to the recording of oral statements. And in *Terry*, the Court abandoned its traditional view that a seizure under the Fourth Amendment required probable cause, and, instead, expanded the definition of a seizure to include an investigative stop made on less than probable cause. Thus, the major premise underpinning the majority's entire analysis today—that the common law of arrest should define the term "seizure" for Fourth Amendment purposes, see *ante*, at 624–625—is seriously flawed. The Court mistakenly hearkens back to common law, while ignoring the expansive approach that the Court has taken in Fourth Amendment analysis since *Katz* and *Terry*.[11]

## II

The Court fares no better when it tries to explain why the proper definition of the term "seizure" has been an open question until today. In *Terry*, in addition to stating that a seizure occurs "whenever a police officer accosts an individual and restrains his freedom to walk away," 392 U. S., at 16, the Court noted that a seizure occurs "when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen . . . ." *Id.*, at 19, n. 16. The touchstone of a seizure is the restraint of an individual's personal liberty *"in some way." Ibid.* (emphasis added).[12] Today the Court's reaction to respondent's reliance on *Terry*

---

[11] It is noteworthy that the Court has relied so heavily on cases and commentary that antedated *Katz* and *Terry*.

[12] "The essential teaching of the Court's decision in *Terry*—that an individual's right to personal security and freedom must be respected even in encounters with the police that fall short of full arrest—has been consistently reaffirmed." *INS* v. *Delgado*, 466 U. S. 210, 227 (1984) (Brennan, J., concurring in part and dissenting in part).

is to demonstrate that in "show of force" cases no common-law arrest occurs unless the arrestee *submits*. See *ante*, at 626–627. That answer, however, is plainly insufficient given the holding in *Terry* that the Fourth Amendment applies to stops that need not be justified by probable cause in the absence of a full-blown arrest.

In *United States* v. *Mendenhall*, 446 U. S. 544 (1980), the Court "adhere[d] to the view that a person is 'seized' only when, by means of physical force or a show of authority, his freedom of movement is restrained." *Id.*, at 553. The Court looked to whether the citizen who is questioned "remains free to disregard the questions and walk away," and if he or she is able to do so, then "there has been no intrusion upon that person's liberty or privacy" that would require some "particularized and objective justification" under the Constitution. *Id.*, at 554. The test for a "seizure," as formulated by the Court in *Mendenhall*, was whether, "in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *Ibid.* Examples of seizures include "the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." *Ibid.* The Court's unwillingness today to adhere to the "reasonable person" standard, as formulated by Justice Stewart in *Mendenhall*, marks an unnecessary departure from Fourth Amendment case law.

The Court today draws the novel conclusion that even though no seizure can occur *unless* the *Mendenhall* reasonable person standard is met, see *ante*, at 628, the fact that the standard has been met does not necessarily mean that a seizure has occurred. See *ibid.* (*Mendenhall* "states a *necessary*, but not a *sufficient* condition for seizure . . . effected

through a 'show of authority'"). If it were true that a seizure requires more than whether a reasonable person felt free to leave, then the following passage from the Court's opinion in *INS* v. *Delgado*, 466 U. S. 210 (1984), is at best, seriously misleading:

> "As we have noted elsewhere: 'Obviously, not all personal intercourse between policemen and citizens involves "seizures" of persons. Only when the officer, by means of physical force or show of authority, has restrained the liberty of a citizen may we conclude that a "seizure" has occurred.' *Terry* v. *Ohio, supra*, at 19, n. 16. While applying such a test is relatively straightforward in a situation resembling a traditional arrest, see *Dunaway* v. *New York*, 442 U. S. 200, 212–216 (1979), the protection against unreasonable seizures also extends to 'seizures that involve only a brief detention short of traditional arrest.' *United States* v. *Brignoni-Ponce*, 422 U. S. 873, 878 (1975). What has evolved from our cases is a determination that an initially consensual encounter between a police officer and a citizen can be transformed into a seizure or detention within the meaning of the Fourth Amendment, 'if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.' *Mendenhall, supra*, at 554 (footnote omitted); see *Florida* v. *Royer*, 460 U. S. 491, 502 (1983) (plurality opinion)." *Id.*, at 215.

More importantly, in *Florida* v. *Royer*, 460 U. S. 491 (1983), a plurality of the Court adopted Justice Stewart's formulation in *Mendenhall* as the appropriate standard for determining when police questioning crosses the threshold from a consensual encounter to a forcible stop. In *Royer*, the Court held that an illegal seizure had occurred. As a

predicate for that holding, JUSTICE WHITE, in his opinion for the plurality, explained that the citizen "may not be detained *even momentarily* without reasonable, objective grounds for doing so; and his refusal to listen or answer does not, without more, furnish those grounds. *United States* v. *Mendenhall, supra,* at 556 (opinion of Stewart, J.)." 460 U. S., at 498 (emphasis added). The rule looks, not to the subjective perceptions of the person questioned, but rather, to the objective characteristics of the encounter that may suggest whether a reasonable person would have felt free to leave.

Even though momentary, a seizure occurs whenever an objective evaluation of a police officer's show of force conveys the message that the citizen is not entirely free to leave—in other words, that his or her liberty is being restrained in a significant way. That the Court understood the *Mendenhall* definition as both necessary and sufficient to describe a Fourth Amendment seizure is evident from this passage in our opinion in *United States* v. *Jacobsen,* 466 U. S. 109 (1984):

> "A 'seizure' of property occurs when there is some meaningful interference with an individual's possessory interests in that property.[5]

"[5] See *United States* v. *Place,* 462 U. S. 696 (1983); *id.,* at 716 (BRENNAN, J., concurring in result); *Texas* v. *Brown,* 460 U. S. 730, 747–748 (1983) (STEVENS, J., concurring in judgment); see also *United States* v. *Chadwick,* 433 U. S. 1, 13–14, n. 8 (1977); *Hale* v. *Henkel,* 201 U. S. 43, 76 (1906). While the concept of a 'seizure' of property is not much discussed in our cases, this definition follows from our oft-repeated definition of the 'seizure' of a person within the meaning of the Fourth Amendment—meaningful interference, however brief, with an individual's freedom of movement. See *Michigan* v. *Summers,* 452 U. S. 692, 696 (1981); *Reid* v. *Georgia,* 448 U. S. 438, 440, n. (1980) *(per curiam); United States* v. *Mendenhall,* 446 U. S. 544, 551–554 (1980) (opinion of Stewart, J.); *Brown* v. *Texas,* 443 U. S. 47, 50 (1979); *United States* v. *Brignoni-Ponce,* 422 U. S. 873, 878 (1975); *Cupp* v. *Murphy,* 412 U. S. 291, 294–295 (1973); *Davis* v. *Mississippi,*

394 U. S. 721, 726–727 (1969); *Terry* v. *Ohio*, 392 U. S., at 16, 19, n. 16." *Id.*, at 113, and n. 5.

Finally, it is noteworthy that in *Michigan* v. *Chesternut*, 486 U. S. 567 (1988), the State asked us to repudiate the reasonable person standard developed in *Terry*, *Mendenhall*, *Delgado*, and *Royer*.[13] We decided, however, to "adhere to our traditional contextual approach," 486 U. S., at 573. In our opinion, we described Justice Stewart's analysis in *Mendenhall* as "a test to be applied in determining whether 'a person has been "seized" within the meaning of the Fourth Amendment'" and noted that "[t]he Court has since embraced this test." 486 U. S., at 573. Moreover, in commenting on the virtues of the test, we explained that it focused on the police officer's conduct:

> "The test's objective standard—looking to the reasonable man's interpretation of the conduct in question—allows the police to determine in advance whether the conduct contemplated will implicate the Fourth Amendment." *Id.*, at 574.

Expressing his approval of the Court's rejection of Michigan's argument in *Chesternut*, Professor LaFave observed:

> "The 'free to leave' concept, in other words, has nothing to do with a particular suspect's choice to flee rather than submit or with his assessment of the probability of successful flight. Were it otherwise, police would be encouraged to utilize a very threatening but sufficiently slow chase as an evidence-gathering technique whenever they lack even the reasonable suspicion needed for a *Terry* stop." 3 W. LaFave, Search and Seizure § 9.2, p. 61 (2d ed. 1987, Supp. 1991).

---

[13] "Petitioner argues that the Fourth Amendment is never implicated until an individual stops in response to the police's show of authority. Thus, petitioner would have us rule that a lack of objective and particularized suspicion would not poison police conduct, no matter how coercive, as long as the police did not succeed in actually apprehending the individual." *Michigan* v. *Chesternut*, 486 U. S., at 572.

Whatever else one may think of today's decision, it unquestionably represents a departure from earlier Fourth Amendment case law. The notion that our prior cases contemplated a distinction between seizures effected by a touching on the one hand, and those effected by a show of force on the other hand, and that all of our repeated descriptions of the *Mendenhall* test stated only a necessary, but not a sufficient, condition for finding seizures in the latter category, is nothing if not creative lawmaking. Moreover, by narrowing the definition of the term seizure, instead of enlarging the scope of reasonable justifications for seizures, the Court has significantly limited the protection provided to the ordinary citizen by the Fourth Amendment. As we explained in *Terry:*

> "The danger in the logic which proceeds upon distinctions between a 'stop' and an 'arrest,' or 'seizure' of the person, and between a 'frisk' and a 'search' is twofold. It seeks to isolate from constitutional scrutiny the initial stages of the contact between the policeman and the citizen. And by suggesting a rigid all-or-nothing model of justification and regulation under the Amendment, it obscures the utility of limitations upon the scope, as well as the initiation, of police action as a means of constitutional regulation." *Terry* v. *Ohio*, 392 U. S., at 17.

## III

In this case the officer's show of force—taking the form of a head-on chase—adequately conveyed the message that respondent was not free to leave.[14] Whereas in *Mendenhall*, there was "nothing in the record [to] sugges[t] that the re-

---

[14] The California Court of Appeal noted:

"This case involves more than a pursuit, as Officer Pertoso did not pursue [respondent], but ran in such a fashion as to cut him off and confront him head on. Under the rationale of *Chesternut*, this action is reasonably perceived as an intrusion upon one's freedom of movement and as a maneuver intended to block or 'otherwise control the direction or speed' of one's movement." App. A to Pet. for Cert. 9.

spondent had any objective reason to believe that she was not free to end the conversation in the concourse and proceed on her way," 446 U. S., at 555, here, respondent attempted to end "the conversation" before it began and soon found himself literally "not free to leave" when confronted by an officer running toward him head-on who eventually tackled him to the ground. There was an interval of time between the moment that respondent saw the officer fast approaching and the moment when he was tackled, and thus brought under the control of the officer. The question is whether the Fourth Amendment was implicated at the earlier or the later moment.

Because the facts of this case are somewhat unusual, it is appropriate to note that the same issue would arise if the show of force took the form of a command to "freeze," a warning shot, or the sound of sirens accompanied by a patrol car's flashing lights. In any of these situations, there may be a significant time interval between the initiation of the officer's show of force and the complete submission by the citizen. At least on the facts of this case, the Court concludes that the timing of the seizure is governed by the citizen's reaction, rather than by the officer's conduct. See *ante*, at 626–627. One consequence of this conclusion is that the point at which the interaction between citizen and police officer becomes a seizure occurs, not when a reasonable citizen believes he or she is no longer free to go, but, rather, only after the officer exercises control over the citizen.

In my view, our interests in effective law enforcement and in personal liberty[15] would be better served by adhering to a standard that "allows the police to determine in advance whether the conduct contemplated will implicate the Fourth

_____

[15] "To determine the constitutionality of a seizure '[w]e must balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion.'" *Tennessee* v. *Garner*, 471 U. S. 1, 8 (1985) (citation omitted).

Amendment." *Chesternut*, 486 U. S., at 574. The range of possible responses to a police show of force, and the multitude of problems that may arise in determining whether, and at which moment, there has been "submission," can only create uncertainty and generate litigation.

In some cases, of course, it is immediately apparent at which moment the suspect submitted to an officer's show of force. For example, if the victim is killed by an officer's gunshot,[16] as in *Tennessee* v. *Garner*, 471 U. S. 1, 11 (1985) ("A police officer may not seize an unarmed, nondangerous suspect by shooting him dead"),[17] or by a hidden roadblock, as in *Brower* v. *Inyo County*, 489 U. S. 593 (1989), the submission is unquestionably complete. But what if, for example, William James Caldwell (Brower) had just been wounded before being apprehended? Would it be correct to say that no seizure had occurred and therefore the Fourth Amendment was not implicated even if the pursuing officer had no justification whatsoever for initiating the chase? The Court's opinion in *Brower* suggests that the officer's responsibility should not depend on the character of the victim's evasive action. The Court wrote:

> "Brower's independent decision to continue the chase can no more eliminate respondents' responsibility for the termination of his movement effected by the roadblock than Garner's independent decision to flee eliminated the Memphis police officer's responsibility for the termination of his movement effected by the bullet." *Id.*, at 595.

---

[16] Even under the common law, "If an officer shoots at an arrestee when he is not privileged to do so, he is guilty of an aggravated assault. And if death results from an arrest, or attempted arrest, which was not authorized at all, . . . the arrester is guilty of manslaughter or, in extreme cases, of murder." Perkins, 25 Iowa L. Rev., at 263–264.

[17] In *Tennessee* v. *Garner*, even the dissent agreed with the majority that the police officer who shot at a fleeing suspect had " 'seized' [the suspect] by shooting him." 471 U. S., at 25 (O'CONNOR, J., dissenting).

It seems equally clear to me that the constitutionality of a police officer's show of force should be measured by the conditions that exist at the time of the officer's action. A search must be justified on the basis of the facts available at the time it is initiated; the subsequent discovery of evidence does not retroactively validate an unconstitutional search. The same approach should apply to seizures; the character of the citizen's response should not govern the constitutionality of the officer's conduct.

If an officer effects an arrest by touching a citizen, apparently the Court would accept the fact that a seizure occurred, even if the arrestee should thereafter break loose and flee. In such a case, the constitutionality of the seizure would be evaluated as of the time the officer acted. That category of seizures would then be analyzed in the same way as searches, namely, was the police action justified when it took place? It is anomalous, at best, to fashion a different rule for the subcategory of "show of force" arrests.

In cases within this new subcategory, there will be a period of time during which the citizen's liberty has been restrained, but he or she has not yet completely submitted to the show of force. A motorist pulled over by a highway patrol car cannot come to an immediate stop, even if the motorist intends to obey the patrol car's signal. If an officer decides to make the kind of random stop forbidden by *Delaware* v. *Prouse*, 440 U. S. 648 (1979), and, after flashing his lights, but before the vehicle comes to a complete stop, sees that the license plate has expired, can he justify his action on the ground that the seizure became lawful after it was initiated but before it was completed? In an airport setting, may a drug enforcement agent now approach a group of passengers with his gun drawn, announce a "baggage search," and rely on the passengers' reactions to justify his investigative stops? The holding of today's majority fails to recognize the coercive and intimidating nature of such behavior and creates a rule that may allow such behavior to go unchecked.

The deterrent purposes of the exclusionary rule focus on the conduct of law enforcement officers and on discouraging improper behavior on their part,[18] and not on the reaction of the citizen to the show of force. In the present case, if Officer Pertoso had succeeded in tackling respondent before he dropped the rock of cocaine, the rock unquestionably would have been excluded as the fruit of the officer's unlawful seizure. Instead, under the Court's logic-chopping analysis, the exclusionary rule has no application because an attempt to make an unconstitutional seizure is beyond the coverage of the Fourth Amendment, no matter how outrageous or unreasonable the officer's conduct may be.

It is too early to know the consequences of the Court's holding. If carried to its logical conclusion, it will encourage unlawful displays of force that will frighten countless innocent citizens into surrendering whatever privacy rights they

---

[18] The purpose of the Fourth Amendment is " 'to prevent arbitrary and oppressive interference by enforcement officials with the privacy and personal security of individuals.' " *INS* v. *Delgado*, 466 U. S., at 215 (quoting *United States* v. *Martinez-Fuerte*, 428 U. S. 543, 554 (1976)); see *Mendenhall*, 446 U. S., at 553–554 (same); *Terry* v. *Ohio*, 392 U. S., at 12 ("Ever since its inception, the rule excluding evidence seized in violation of the Fourth Amendment has been recognized as a principal mode of discouraging lawless police conduct"); 4 W. LaFave, Search and Seizure § 11.4(j), pp. 459–460 (2d ed. 1987) ("Incriminating admissions and attempts to dispose of incriminating evidence are common and predictable consequences of illegal arrests and searches, and thus to admit such evidence would encourage such Fourth Amendment violations in future cases").

Justice Brandeis wrote eloquently about the overarching purpose of the Fourth Amendment:

"The makers of our Constitution . . . sought to protect Americans in their beliefs, their thoughts, their emotions and their sensations. They conferred, as against the Government, the right to be let alone—the most comprehensive of rights and the right most valued by civilized men. To protect that right, every unjustifiable intrusion by the Government upon the privacy of the individual, whatever the means employed, must be deemed a violation of the Fourth Amendment." *Olmstead* v. *United States*, 277 U. S. 438, 478 (1928) (dissenting opinion).

Today's opinion has lost sight of these purposes.

may still have. It is not too soon, however, to note the irony in the fact that the Court's own justification for its result is its analysis of the rules of the common law of arrest that antedated our decisions in *Katz* and *Terry*. Yet, even in those days the common law provided the citizen with protection against an attempt to make an unlawful arrest. See nn. 5 and 7, *supra*. The central message of *Katz* and *Terry* was that the protection the Fourth Amendment provides to the average citizen is not rigidly confined by ancient common-law precept. The message that today's literal-minded majority conveys is that the common law, rather than our understanding of the Fourth Amendment as it has developed over the last quarter of a century, defines, and limits, the scope of a seizure. The Court today defines a seizure as commencing, not with egregious police conduct, but rather with submission by the citizen. Thus, it both delays the point at which "the Fourth Amendment becomes relevant"[19] to an encounter and limits the range of encounters that will come under the heading of "seizure." Today's qualification of the Fourth Amendment means that innocent citizens may remain "secure in their persons . . . against unreasonable searches and seizures" only at the discretion of the police.[20]

Some sacrifice of freedom always accompanies an expansion in the Executive's unreviewable[21] law enforcement pow-

---

[19] *Terry* v. *Ohio*, 392 U. S., at 16.

[20] Justice Jackson presaged this development when he wrote:

"[A]n illegal search and seizure usually is a single incident, perpetrated by surprise, conducted in haste, kept purposely beyond the court's supervision and limited only by the judgment and moderation of officers whose own interests and records are often at stake in the search. . . . The citizen's choice is quietly to submit to whatever the officers undertake or to resist at risk of arrest or immediate violence." *Brinegar* v. *United States*, 338 U. S. 160, 182 (1949) (dissenting opinion).

[21] "[T]he right to be secure against searches and seizures is one of the most difficult to protect. Since the officers are themselves the chief invaders, there is no enforcement outside of court. . . . There may be, and I am convinced that there are, many unlawful searches of homes and automo-

ers.  A court more sensitive to the purposes of the Fourth Amendment would insist on greater rewards to society before decreeing the sacrifice it makes today.  Alexander Bickel presciently wrote that "many actions of government have two aspects: their immediate, necessarily intended, practical effects, and their perhaps unintended or unappreciated bearing on values we hold to have more general and permanent interest."[22]  The Court's immediate concern with containing criminal activity poses a substantial, though unintended, threat to values that are fundamental and enduring.

I respectfully dissent.

---

biles of innocent people which turn up nothing incriminating, in which no arrest is made, about which courts do nothing, and about which we never hear."  *Id.*, at 181 (Jackson, J., dissenting).

[22] The Least Dangerous Branch 24 (1962).