30 F.3d 128
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
Robert Edwin CARTER, Plaintiff-Appellant,
v.
D.O. LUCAS; R.D. Gillespie; F.S. Earman; J.R. Buckalew,
Superintendent of West Virginia State Police; Glennm.
Weatherholtz, Sheriff of Rockingham County; State of West
Virginia; Rockingham County, Virginia, Defendants-Appellees.
 No. 93-1804.
 United States Court of Appeals, Fourth Circuit.
 Argued Feb. 8, 1994.
Decided July 20, 1994.
 
 Appeal from the United States District Court for the Western District of Virginia, at Harrisonburg. James H. Michael Jr., District Judge. (CA-92-63-H)
 Leslie Ann Shaner, Singleton & Deeds, Monterey, VA, for appellant.
 Leon Francis Szeptycki, McGurie, Woods, Battle & Boothe, Charlottesville, VA, for appellees Gillespie, Lucas, and WVA.
 J. Ross Newell, III, Timberlake, Smith, Thomas & Moses, Staunton, VA, for appellees Earman, Weatherholtz, and Rockingham County.
 John C. Singleton, Singleton & Deeds, Monterey, VA, for appellant.
 R.Craig Wood, McGuire, Woods, Battle & Boothe, Charlottville, VA, for appellees Gillespie, Lucas, and WVA.
 AFFIRMED.
 Before RUSSELL, Circuit Judge, CHAPMAN, Senior Circuit Judge, and TILLEY, United States District Judge for the Middle District of North Carolina, sitting by designation.
 OPINION
 PER CURIAM:
 
 
 1
 Plaintiff appeals the summary judgment dismissal of various claims under 42 U.S.C. Sec. 1983 and the dismissal without prejudice of several pendent state law claims under 28 U.S.C. Sec. 1347. This court has jurisdiction pursuant to 28 U.S.C. Sec. 1291. Appellate review of summary judgment proceedings is conducted de novo. For the reasons stated below, the judgment of the district court is AFFIRMED in all respects.
 
 I.
 
 2
 The facts, stated in the light most favorable to Plaintiff-Appellant Robert Edwin Carter, show the following. Carter and his friend Charles Vandevander spent the day of June 16, 1990, moving Vandevander's furniture into Carter's home. They began drinking beer sometime prior to noon and continued to drink as they worked all day and into the evening. Later that night, Carter and Vandevander went to a Pizza Hut on South Main Street in Harrisonburg, Virginia. At the Pizza Hut, the two shared a pizza and at least one large pitcher of beer. Carter then left the restaurant and "passed out" in the cab of his red Toyota pick-up truck.
 
 
 3
 Carter was awakened some time later by Vandevander striking him across the chest. Vandevander was driving and stated that the police were chasing them. Carter told Vandevander to pull over. Vandevander, who was a Virginia "repeat offender," replied that he would rather die than return to jail. Vandevander did not have a driver's license.
 
 
 4
 Frank Earman, a Rockingham County, Virginia, deputy sheriff, first encountered the red Toyota truck at a stoplight in Harrisonburg. When the light turned green, the Toyota spun its tires and "fish tailed" down the street. Earman turned on his emergency lights and siren and attempted to stop the Toyota. The truck refused to stop and a 37-mile chase ensued. The chase began between midnight and 1:00 a.m. on June 17.
 
 
 5
 The first few miles of the chase were at relatively low speeds as the vehicles moved through the town of Harrisonburg. A Harrisonburg police car joined the pursuit before the vehicles left the city limits. As the vehicles moved out of town and onto a state highway, the speed of the chase increased dramatically. Deputy Earman states that the vehicles reached speeds in excess of 80 miles per hour. Carter, whose memory was admittedly fogged by extreme intoxication, estimates the top speed at 100 miles per hour. There was virtually no oncoming traffic during the entire length of the chase.
 
 
 6
 As the chase moved toward the West Virginia state line, Earman radioed his dispatcher to notify the West Virginia State Police that a high speed chase was about to enter their jurisdiction. Throughout most of the chase, Earman could not contact West Virginia troopers directly because of equipment limitations and transmission "masking" due to mountains in the area. Except for one brief transmission very near the end of the chase, all communication between the officers had to be routed through both the Virginia and West Virginia dispatchers.
 
 
 7
 Prior to entering West Virginia, Earman learned that the Toyota was owned by Carter and that the truck was registered to a local Virginia address. At some point during the chase, Earman used his spotlight to illuminate the Toyota from the rear and was able to see that there were two people in the truck.
 
 
 8
 Three state troopers are assigned to Pendelton County West Virginia. Trooper David Lucas was on duty and was notified of the pursuit by the West Virginia dispatcher. Trooper Richard Gillespie was not on duty but was monitoring his police scanner at home. Upon hearing that Lucas was some distance from the path of the chase, Trooper Gillespie notified the dispatcher that he was coming on duty to assist in the chase. The only information that Lucas and Gillespie had was that a high speed pursuit was entering their jurisdiction and that it involved traffic violations.
 
 
 9
 Because of communications problems and his distance from the path of the chase, Trooper Lucas was unable to get in proper position to assist in the chase. He encountered the red Toyota while he was going east and it was traveling west. Lucas clocked the speed of the Toyota at 74 miles per hour. Lucas radioed the speed and location of the chase to Trooper Gillespie.
 
 
 10
 Meanwhile, Trooper Gillespie was able to get into position several miles ahead of the pursuit. He decided to attempt a rolling roadblock. A rolling roadblock is a procedure whereby a police vehicle takes up a position in front of, traveling in the same direction and at roughly the same speed as, the pursued vehicle. The police vehicle then occupies both lanes of the road, attempting to force the fleeing car to slow down and eventually stop. Trooper Gillespie had used this maneuver successfully to stop speeding vehicles on several occasions.
 
 
 11
 Gillespie picked out a relatively straight and level patch of road just west of Franklin, West Virginia, as a good place to attempt the maneuver. He made radio contact with Earman as the chase came down a mountain just east of his position. Gillespie instructed Earman to back off to make room for the rolling roadblock.
 
 
 12
 As the chase approached, Gillespie turned on his lights and siren and proceeded west, in the direction of the chase, at a speed of "no less than 70 miles per hour." Within one minute the Red Toyota came up behind Gillespie's vehicle. Vandevander, still driving the Toyota, attempted to pass first on the left and then on the right. Both attempts were blocked by Gillespie. Gillespie began to decelerate by taking his foot off the accelerator and not applying his brakes. Vandevander accelerated and attempted to pass a third time, this time on the left side of Gillespie's vehicle. Gillespie believed that a collision was imminent and moved his vehicle back into the right lane. No collision occurred. However, in his determination to pass Gillespie's vehicle, Vandevander allowed the Toyota's left tires to go off the left side of the road. He then lost control and the Toyota slid back across the highway in front of Gillespie. Gillespie applied his brakes in order to prevent a collision. The Toyota then went off the road to the right, into the air, hit one tree, and came to rest against another tree at the bottom of an embankment.
 
 
 13
 Vandevander was killed instantly. Carter suffered painful and permanent injuries, primarily to his legs, although he has returned to the same job he had prior to the accident.
 
 
 14
 Carter brought this Sec. 1983 action against all police officers named above (except Lucas) in their individual and official capacities, against West Virginia State Police Superintendent Buckalew in his personal and official capacities, and against the state of West Virginia.
 
 II.
 
 15
 Carter's claim is that the rolling roadblock was an unconstitutional seizure in violation of the Fourth and Fourteenth Amendments and 42 U.S.C. Sec. 1983. A Fourth Amendment seizure occurs when a fleeing person or vehicle either yields to a show of authority or is stopped by the intentional application of physical force. California v. Hodari D., 499 U.S. 621 (1991); Brower v. County of Inyo, 489 U.S. 593 (1989); Tennessee v. Garner, 471 U.S. 1 (1985).
 
 
 16
 Both parties cite Brower as authoritative on the issue of whether a seizure occurred. In Brower, police set up a tractor-trailer behind a curve and across both lanes of a two lane highway. The police then positioned cars facing the direction of an oncoming suspect and focused bright lights and spot lights so as to blind the driver and, effectively, conceal the tractor-trailer. If the suspect failed to stop for the police vehicles he would be unable to avoid the hidden tractor-trailer. The suspect did not stop and was killed on impact with the truck.
 
 
 17
 Brower states the rule that a seizure by the application of physical force occurs when there is "a governmental termination of movement through means intentionally applied." Brower, 489 U.S. at 597. Justice Scalia, writing for the Court, distinguished a roadblock from the ordinary high speed chase:
 
 
 18
 In marked contrast to a police car pursuing with flashing lights, or to a policeman in the road signaling an oncoming car to halt, [ ] a roadblock is not just a significant show of authority to induce a voluntary stop, but is designed to produce a stop by physical impact if voluntary compliance does not occur.
 
 
 19
 Id., 489 U.S. at 598 (citation omitted). Because the roadblock was intended to stop Brower by physical impact and did so, the Court held that there was a seizure and remanded for a consideration of whether the seizure was reasonable. Id., 489 U.S. at 598-99.
 
 
 20
 There was a seizure in this case if the rolling roadblock was a "governmental termination of freedom of movement through means intentionally applied." Id., 489 U.S. at 597. To begin with, the purpose of the rolling roadblock was to stop the Toyota. However, there was no contact between any police vehicle and the Toyota. Nor was there an attempt to force the Toyota off the road. While there is a possibility that a stop by physical impact could occur during a rolling roadblock, it is undisputed that a rolling roadblock is not designed to cause a physical impact and that Gillespie got out of the way when it became clear that the Toyota was not going to slow down and submit to the authority of the police.
 
 
 21
 We conclude that the rolling roadblock employed in this case was not like the roadblock in Brower. The rolling roadblock was a strong show of authority (to which the Toyota did not yield) rather than an application of physical force (a procedure "designed to produce a stop by physical impact if voluntary compliance does not occur"). Therefore, officer Gillespie's rolling roadblock was not a seizure of the Toyota and no right secured by the Fourth Amendment was violated. Summary judgment was properly granted.* III.
 
 
 22
 Carter argues, alternatively, that the actions taken by police violated his substantive due process rights under the Fourteenth Amendment. Claims that excessive force was applied by the law enforcement officers who were attempting to stop the truck and "seize" its occupants are governed not by considerations of substantive due process but by the Fourth Amendment's standard of objective reasonableness. Graham v. Connor, 490 U.S. 386, 394-95, 397 (1989). Application of this standard requires a "careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight" and requires that those circumstances "must be judged from the perspective of a reasonable officer on the scene." Id. at 396.
 
 
 23
 Taking the facts in the light most favorable to Carter, Vandevander was not only refusing to stop but was driving Carter's truck in a manner that constituted an extreme and immediate danger to unsuspecting motorists. The rolling roadblock was neither designed nor executed by Trooper Gillespie to wreck the truck, but to bring it slowly to a stop. Applying the Graham standard, we do not believe a rational juror could find the actions of any of the officers or other parties to have been objectively unreasonable. Summary judgment on Carter's substantive due process claim was appropriate.
 
 IV.
 
 24
 Carter's argument that he should be awarded attorney fees from the State of West Virginia is devoid of merit. A state is not responsible for attorney fees under 42 U.S.C. Sec. 1988 absent underlying liability on the merits. Kentucky v. Graham, 473 U.S. 159, 164 (1985).
 
 V.
 
 25
 For the foregoing reasons, the district court's award of summary judgment in favor of the defendants, on all issues, is affirmed.
 
 AFFIRMED
 
 
 *
 Even assuming that the rolling roadblock was a seizure, we would nonetheless affirm. Under the totality of the circumstances, the actions taken by police were justified, making such an assumed seizure reasonable as required by the Fourth Amendment. Graham v. Connor, 490 U.S. 386, 396-97 (1989). Our finding that there was not a seizure in this case moots the questions of 11th Amendment immunity, supervisory liability, and qualified immunity