ROTHENBERG, J.
(dissent).
Based on the facts of this case, many of which were omitted in the majority opinion, I would reverse the trial court’s order suppressing the marijuana found on D.F.’s person after his lawful arrest, which was based on a separate cache of marijuana he abandoned prior to being seized.
Pursuant to a multi-agency investigation, several units[8] responded to the Lincoln Fields apartment complex and entered the fenced-in complex from several different locations wearing bulletproof vests. Detective Fowler, a Miami-Dade police officer who was stationed on the opposite side of 20th Avenue across the street from the apartment complex, was assigned to serve as the “eyeball” of the operation. Detective Fowler testified that he was watching D.F. and another individual, who were seated on a stairway located near the corner of one of the apartment buildings and approximately six to eight feet from a breezeway between two apartment buildings as the officers entered through various openings into the complex. He testified that as the officers, who were coming from the south, came into his view (he was using binoculars), he saw D.F. throw down several baggies of marijuana. He continued to watch the officers as they walked right past D.F. as they headed into the breezeway. When Detective Fowler approached the breezeway, he noted that law enforcement had several individuals detained and seated on the ground, whereas D.F. and his companion were still sitting on the stairs and other residents and individuals had exited apartments or had come into the area to see what was going on. Detective Fowler retrieved the baggies of marijuana he witnessed D.F. discard, asked D.F. to come downstairs, and placed D.F. under arrest. While D.F. was being processed at the Juvenile Assessment Center, additional marijuana was found hidden in D.F.’s hair.
When asked at what point D.F. threw down the baggies of marijuana, Detective Fowler testified as follows:
A: ... The units that came in from the south park walked directly past [D.F.] along with another young male and went to the breezeway area.
Q: Okay. So they didn’t stop [D.F.] at that time....
A: No.
Q: ... [I]s that correct? And so they continued past him to the breezeway and what, if anything, happened next?
A: Well, prior to them coming into my view walking past [D.F.] in the breezeway, I had my eye on [D.F.] and the other individual through binoculars. I observed [D.F.] from his left hand throw out what appeared to be some small baggies of marijuana to the ground.
*222 Q: Okay. Now at what point during the approach or not during the approach, if that’s the case, did he drop the baggies?
A: Right as the officers coming from the south came into my view. So I don’t know if he saw them further away coming northbound, but as I saw them is when I saw him....
Q: Okay. But they weren’t approaching him, right?
A: No, they actually walked right past him.
Q: And they weren’t going in his direction?
A: That stairwell is basically right at the corner of that building. They were technically going towards his direction, but not to him.
Q: Okay. But they passed him and went down the breezeway, right?
A: Yes.
[[Image here]]
Q: Was any of this police activity directed towards this individual?
[[Image here]]
A: They were directed towards the breezeway and then west of [D.F.]. To the west side of the building, but not directly — directed directly towards him.
D.F., who also testified, confirmed Detective Fowler’s testimony and explained that the police perform regular investigations at the apartment complex “[l]ike, Tuesdays and Thursdays or something ... [y]eah, every other day.” He testified that on this particular occasion the police ordered certain people to “get down.” But that these orders were not directed to him and he was free to leave.
Q: You said that the officers would go and stop certain people, right? ... But they didn’t stop you?
A: No. I was sitting in the stairwell. No — can’t really see me. I wasn’t walking nowhere. I was just sitting on the step.
Q: So you weren’t afraid that they were coming after you, right?
A: Yeah.
Q: Yeah — I’m sorry, you mean....
A: Like, I wasn’t afraid.
Q: Okay. And so you said you felt like you were free to go at that time, right?
A: Uh-huh.
Q: I’m sorry?
A: Yes
Despite this testimony, the trial court and the majority concluded that, prior to abandoning the marijuana, D.F. had been “seized” and thus the marijuana D.F. abandoned and the marijuana subsequently found on D.F.’s person must be suppressed as fruit of the illegal seizure. I respectfully disagree.
In determining whether a “seizure” has occurred the United States Supreme Court and our Florida Supreme Court have specifically held that the totality of all of the circumstances surrounding the specific encounter must be considered. See United States v. Mendenhall, 446 U.S. 544, 554, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980); G.M. v. State, 19 So.3d 973, 978 (Fla.2009). In California v. Hodari D., 499 U.S. 621, 626, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991), the United States Supreme Court clarified that for a “seizure” to have occurred, either the person must be physically subdued, or he must submit to the officer’s assertion of authority. Although the United States Supreme Court recognized that the test to be applied when determining whether an individual has been seized is an objective one, it held that “[a] person has been ‘seized’ within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave,” and *223 cautioned that one must read this requirement carefully because the test “says that a person has been seized ‘only if,’ not that he has been seized ‘whenever.’ ” Hodari, 499 U.S. at 627-28, 111 S.Ct. 1547.
Under the totality of the circumstances in this case, the evidence should not have been suppressed. Although there was clearly a show of authority — multiple officers in vests and with guns drawn — D.F. testified that this occurs “every other day”; the police activity and commands to get down on the ground were not directed towards him; the officers were not even aware that D.F., who was seated on the stairway several feet from the breezeway where the officers were directing their attention, was even present; the officers did not approach D.F. and in fact walked past him; D.F. did not submit to the commands to get down on the ground; he did not feel threatened and believed he was free to leave; and had he not thrown down the drugs as he saw the officers approaching, he would not have been involved at all. Under these circumstances, I would find that D.F. voluntarily abandoned the marijuana.
Additionally, the Florida Supreme Court in Hollinger v. State, 620 So.2d 1242, 1242 (Fla.1993), specifically recognized that where a person abandons contraband prior to being seized, the evidence should be admitted, citing to Hodari. In the instant case, D.F. abandoned the baggies of marijuana prior to the officers entering the breezeway, prior to any commands, and prior to the officers even being made aware of D.F.’s presence in the stairwell. Additionally, D.F. testified that none of the commands were directed towards him; he did not comply with the demands; and he felt that he, like the other residents and individuals that congregated in the area to watch the incident, was free to leave. Thus, D.F. did not, by his own admission, submit to the show of authority even after he voluntarily abandoned the contraband.
For these reasons, and based on the specific facts of this case, I would reverse the trial court’s order suppressing the drugs found abandoned by D.F. and subsequently found on his person after his arrest.

. Approximately twenty officers were involved in the operation, however D.F. testified that he only saw eleven.