STATE of Missouri, Respondent,

v.

**Jaime HERNANDEZ, Appellant.**

No. WD 53131.

Missouri Court of Appeals,
Western District.

Oct. 28, 1997.

Andrew A. Schroeder, Asst. Public Defender, Kansas City, for appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Breck K. Burgess, Asst. Atty. Gen., Jefferson City, for respondent.

Before SMART, P.J., and LOWENSTEIN and LAURA DENVIR STITH, JJ.

SMART, Judge.

After a jury trial in Jackson County Circuit Court, Jaime Hernandez was convicted of the Class D felony of unlawful use of a weapon pursuant to § 571.030.1(4), RSMo Supp.1995, and sentenced to twelve months in prison. Hernandez now appeals, claiming that the circuit court clearly erred in admitting into evidence a knife that the police recovered from him after they seized him. Hernandez contends that the knife was obtained only after the police unlawfully seized him, and thus the knife was inadmissible as "fruit of the poisonous tree." We affirm the appellant's conviction and sentence.

At 12:04 p.m. on the afternoon of December 29, 1995, Kansas City Police Department Officers Donald Angle, Greg Volker, and Ronald Fletcher responded to a department radio dispatch reporting that some men described only as Hispanics were throwing rocks at the back a of building in an alley between Madison and Summit near the intersection of 23rd Street and Southwest Boulevard. The officers, who were all in uniform and driving separate marked police cars, met one or two blocks east of the call before going in to the area of the reported disturbance. They then proceeded together to the incident scene with Volker's car in front and Fletcher's car bringing-up the rear.

Upon arriving in the alley, the Officers Volker and Angle saw four to six men who appeared to be Hispanic. As Officer Volker emerged from his patrol car and approached the group of men, Officer Volker saw one of the men, Defendant Hernandez, place his hands in his coat pocket. Hernandez then abruptly turned away from Officer Volker and ran away from him. At that point Officer Volker yelled, "Stop, police," but Hernandez continued running. Officers Volker and Angle (who had since emerged from his patrol car) then pursued Hernandez on foot.

After the chase began, Officer Volker noticed that Hernandez was carrying a black object in his right hand. Officer Fletcher was still in his patrol car and observed the other officers running in pursuit. Officer Volker reported by radio that he was running westbound through the alley. Officer Fletcher heard the communication and, knowing that the alley came out onto Madison, attempted to head-off Hernandez by turning south onto Madison from 23rd Street. Officer Fletcher made visual contact with Hernandez as Hernandez ran out of the alley and then jogged down Madison Avenue toward Southwest Boulevard. Hernandez led the officers across Southwest Boulevard despite the heavy traffic on that street. Officer Fletcher saw Hernandez enter the parking lot of Royal Liquors at 801 Southwest Boulevard and, turning off his siren, pulled into the parking lot behind Hernandez. Hernandez saw Officer Fletcher's car and then dashed across Southwest Boulevard a second time before Officer Fletcher exited his car and gave chase to Hernandez on foot. At this point, Officer Fletcher noticed that Hernandez was carrying a black object in his right hand. Officer Fletcher caught up to Hernandez and tackled him, bringing him to the ground. Hernandez got back on his feet, but Officer Fletcher grabbed him about the waist and tried to pull Hernandez back to the ground. It was while Officer Fletcher was attempting to pull Hernandez back to the ground that Hernandez produced a knife in his right hand, which he raised above his head in order to stab Officer Fletcher in the head and neck area. Officers Angle and Volker, who had arrived at that time, grabbed Hernandez before he could harm Officer Fletcher. Officer Volker then hit Hernandez's right hand against the ground repeatedly until Hernandez dropped the knife. The officers subdued Hernandez, who continued to be hostile and appeared to be in an intoxicated state. After subduing Hernandez, the officers seized the knife and a black sheath. They then placed Hernandez under arrest.

The State charged Hernandez by amended information with unlawful use of a weapon, in

violation of § 571.030.1(4) RSMo Supp.1995 Supp. On June 10, 1996, the case went to trial before a jury in Jackson County Circuit Court. Before the trial, Hernandez sought to suppress the use of the knife as evidence on the ground that it was the "fruit" of an illegal seizure. The trial court denied the motion. At trial, Hernandez renewed his objection and the court overruled Hernandez's objection to admission of the knife. Hernandez testified on his own behalf with the help of an interpreter. He admitted that before the police arrived he had been throwing a knife at a wooden fence. He claimed that the object police saw him put into his pocket was a Bible. Denying that he had any intention of stabbing Officer Fletcher, Hernandez claimed instead that he pulled out his knife in order to throw it away. The jury found Hernandez guilty as charged, and Hernandez was sentenced to twelve months in the custody of the Jackson County Department of Corrections.

Hernandez argues on appeal that the circuit court erred in denying his motion to suppress and then admitting the knife into evidence, alleging that the knife had been acquired as the "fruit" of an illegal seizure. Starting with the premise that the seizure of his person when Officer Fletcher tackled him was not justified by probable cause or reasonable suspicion, Hernandez further argues that he would not have drawn the knife "but for" the illegal seizure. Hernandez thus concludes that the seizure of the knife was tainted by the illegal seizure of his person and that this taint was not attenuated. Since the State would have had no case without the knife, Hernandez maintains that the alleged error was obviously prejudicial.

While it is conceptually interesting that Hernandez claims that his voluntary decision to draw out his knife was the "fruit" of his seizure by police, our finding that the seizure was legal obviates any need to decide whether the evidence to be suppressed was tainted by an illegal seizure.

■ In a hearing to suppress evidence as having been obtained through an unlawful search and seizure, the State has the burden of showing that the motion should be denied. § 542.296.6, RSMo 1994. Once the trial court has made its decision, however, there is an abuse of discretion only if reasonable persons could not differ as to the propriety of the trial court's action. *State v. Jimerson,* 820 S.W.2d 500, 502 (Mo.App.1991).

■ As the Missouri Supreme Court recently noted in *State v. Rushing,* 935 S.W.2d 30, 34 (Mo. banc 1996), the extent of Missouri's constitutional "search and seizure" guarantee (Mo. Const. art. I, § 15) is co-extensive with that of the Fourth Amendment of the United States Constitution, which has been incorporated into the Fourteenth Amendment. *Mapp v. Ohio,* 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961). For purposes of the Fourth Amendment, there is no "seizure" of a person until that person either is subjected to the application of physical force by the police or voluntarily submits to the assertion of police authority. *California v. Hodari D.,* 499 U.S. 621, 626, 111 S.Ct. 1547, 1550–51, 113 L.Ed.2d 690 (1991).

■ An investigative stop short of arrest may be based on reasonable suspicion not rising to the level of probable cause. *Terry v. Ohio,* 392 U.S. 1, 30, 88 S.Ct. 1868, 1884–85, 20 L.Ed.2d 889 (1968). Such reasonable suspicion is present when law enforcement officers have knowledge of specific and articulable facts which, when taken together with rational inferences from those facts, create a reasonable suspicion that a person has or is about to commit a crime. *Rushing,* 935 S.W.2d at 32 (citing *Terry,* 392 U.S. at 30, 88 S.Ct. at 1884–85). In reviewing for reasonable suspicion in street encounters, courts may consider "a police officer's trained instinctive judgment operating on a multitude of small gestures and actions impossible to reconstruct." *Sibron v. New York,* 392 U.S. 40, 78, 88 S.Ct. 1889, 1909–10, 20 L.Ed.2d 917 (1968)(Harlan, J., concurring). *See State v. Sims,* 639 S.W.2d 105, 107 (Mo.App.1982). When multiple police officers are working together closely in order to effect an arrest or engage in an investigatory stop, the Fourth Amendment is satisfied if the information known by all of the officers collectively amounts to probable cause or reasonable suspicion. *See* Wayne R. La-

Fave, Search & Seizure: A Treatise on the Fourth Amendment § § 3.5(b)-(c), 9.4(i) (3d ed.1996). *See also State v. Franklin,* 841 S.W.2d 639, 644 n. 6 (Mo. banc 1992).

█ Because a *Terry* stop is less intrusive than a full arrest, the reasonable suspicion standard is less strict than the probable cause requirement. *State v. Lasley,* 583 S.W.2d 511, 518 (Mo. banc 1979). Reasonable suspicion does not require that the articulable facts and rational inferences on which the police act exclude all possible non-criminal interpretations. *State v. Lanear,* 805 S.W.2d 713, 716 (Mo.App.1991).[1]

For example, in *State v. Adell,* 716 S.W.2d 469 (Mo.App.1986), an officer received a radio dispatch reporting possible criminal activity involving several men and the use of a firearm. The officer saw the defendant and another man walking one block away from the reported scene at 3:30 a.m. The officer then observed that the two men, upon seeing her patrol car, slowed their walking pace, kept looking back at the vehicle, and appeared nervous. *Id.* at 471. The court held that the officer had reasonable suspicion upon which to conduct an investigatory stop.

In *State v. Brown,* 780 S.W.2d 716, 717 (Mo.App.1989), the court held that police had reasonable suspicion to stop a man where the police, answering an emergency call at 1:30 a.m., observed him emerge from behind the building to which police had been dispatched, run away from the police while trying to conceal a box, and continue to run away after an officer's command to stop. In *State v. Thompson,* 826 S.W.2d 17, 19–20 (Mo.App. 1992), a man's presence among a group of men across the street from the address of the scene of a reported general disturbance in an area which the responding officer knew to be the scene of frequent drug sales, combined with the fact that the group dispersed upon the arrival of the officers, gave the

police reasonable suspicion to stop the man. The court observed that depriving the police of the power to make an immediate investigatory stop in such a situation would prevent the police from knowing if any further police action was necessary. *Id.* at 20. In *State v. McKeehan,* 894 S.W.2d 216 (Mo.App.1995), the court held that a police officer had reasonable suspicion to detain an individual when the officer had been dispatched to a parking lot to investigate a reported disturbance. Upon arrival at the parking lot, the officer observed the defendant. During an interview of defendant, defendant appeared distracted and was looking around the parking lot. When two other officers arrived, defendant started running. *Id.* at 218, 221.

█ When courts review an investigatory stop for reasonable suspicion, "the totality of the circumstances, the whole picture, must be taken into account." *State v. Nelson,* 777 S.W.2d 333, 335 (Mo.App.1989). The preceding cases make it clear that, in situations where the police are responding to information received through police channels (e.g., radio dispatch), the existence of certain facts will usually give the police reasonable suspicion for a *Terry* stop when (1) the person stopped is present at or close to the scene of the reported disturbance soon after the dispatch, and (2) that person's behavior indicates a determination to avoid any encounter with the responding officers. The suspicion is even more reasonable when the person stopped matches a general description of a reported perpetrator or when the reported area of disturbance is known to be a high crime area. Absent evidence of a determination to avoid an encounter with investigating police, the State must show that the dispatch itself was based on reasonable suspicion[2] or that the officers had other additional information that made their suspicion reasonable.[3]

---

1. Among the non-criminal explanations offered for his conduct in the instant case, Hernandez suggests that he may have been chasing a pet or hurrying to a job when he twice led the police across busy Southwest Boulevard.

2. If the police rely on the dispatch alone prior to stopping a suspect, the dispatch must have been based on reasonable suspicion lest the police be permitted to use a radio dispatch to refine a raw

"hunch" into reliable information. *State v. Miller,* 894 S.W.2d 649, 653 (Mo. banc 1995); *State v. Franklin,* 841 S.W.2d 639, 643 (Mo. banc 1992).

3. As in *State v. Cobb,* 931 S.W.2d 904, 907 (Mo. App.1996), where this Court held that a radio dispatch combined with factually similar information given to police by two independent, anonymous eye-witnesses in face-to-face encounters

In reviewing the legality of any *Terry* stop, courts must determine at what point in the chronology of events there was a Fourth Amendment "seizure." We conclude in the instant case that, because Hernandez never submitted to the assertion of lawful authority prior to drawing his knife, there was no Fourth Amendment seizure until Officer Fletcher exerted physical force upon Hernandez by tackling him. So long as there was reasonable suspicion to stop Hernandez prior to the moment Officer Fletcher caught up to Hernandez and tackled him, the stop and the evidence obtained therefrom was legal.

Although Hernandez emphasizes his contention that Officer Fletcher individually did not have reasonable suspicion for the investigatory stop, his emphasis and his argument both miss the mark. Whether or not Officer Fletcher was himself aware of specific and articulable facts justifying the investigatory stop, the stop was nevertheless legal if all three officers together had information rising to the level of reasonable suspicion. Officers Volker, Angle, and Fletcher received the same dispatch, met one block away from the scene before finally proceeding together to the scene of the disturbance, and, after arriving there, they cooperated in seizing Hernandez. Officer Fletcher had received a police radio dispatch reporting a disturbance involving several men in an alley near Southwest Boulevard and 23rd Street. After arriving at the entrance to the alley, Officer Fletcher received Officer Volker's radio report that Volker was pursuing a man westbound through the alley to Madison Street. Officer Fletcher observed Hernandez exit the alley onto Madison Street; he then saw Hernandez jog away from his marked patrol car, dash across busy Southwest Boulevard, and continue walking away across a parking lot, even after Officer Fletcher had turned on his siren. Officer Fletcher then saw Hernandez, carrying a black object in his right hand, flee back across Southwest Boulevard upon seeing Officer Fletcher's vehicle. There was a match between Hernandez and the general description of the reported perpetrators (Hispanic males), Hernandez was close in both time and place to the reported disturbance, and Hernandez's conduct showed that Hernandez was determined to avoid an encounter with police even at some risk to life and limb.[4]

The additional facts known by Officers Volker and Angle support the conclusion that the stop was justified by reasonable suspicion. Hernandez and several other men were present in the alley where the disturbance was reported when the Officers Volker and Angle arrived moments after the radio dispatch in marked patrol cars; Hernandez was seen to place an object in his pocket upon the approach of Officer Volker, then turn from the police and start running, which he continued to do even after Officer Volker identified himself as a police officer and ordered Hernandez to stop. The trial court could reasonably have found that the officers collectively had reasonable suspicion to stop Hernandez.

Given that the existence of reasonable suspicion permitted the police to lawfully seize Hernandez for purposes of further investigation, the police were entitled to use "forcible means necessary to effectuate that

sufficed to give police reasonable suspicion to stop the defendant's car.

4. Hernandez actions in running twice across a major boulevard the officers described as "busy" in the middle of the day to avoid Officer Fletcher may have been a sufficiently extreme means of avoidance that it alone gave the police reasonable suspicion to seize Hernandez. *See* LaFave, Search and Seizure, § 9.4(f). Depending on the factual context and manner of the suspect's flight, an attempt to avoid an encounter with the police can be a significant factor in reasonable suspicion. For example, where the defendant matched a superficial description of a wanted robber and parked late at night in front of the same store he was suspected of robbing the previous evening, his driving away from police in a nervous manner was held by this Court to be conduct evidencing consciousness of guilt, thereby giving the police reasonable suspicion to stop his car. *State v. Nelson*, 777 S.W.2d 333, 336 (Mo.App.1989). Running away from the police in a location known by police to be a high crime area was held to provide reasonable suspicion in *State v. Shahid*, 813 S.W.2d 38, 39 (Mo.App. 1991). In *United States v. Jackson*, 741 F.2d 223, 224 (8th Cir.1984), reasonable suspicion was found where the defendant exclaimed "It's police, man, run," then turned and ran away from a routine police patrol.

stop without converting it to an arrest." *McKeehan,* 894 S.W.2d at 220. The evident intention of Hernandez to avoid an encounter with police, even at the risk to life and limb posed by running across a busy boulevard twice, made tackling a forcible means necessary to effectuate the *Terry* stop warranted by the totality of the circumstances known to the officers.

█ Because the evidence showed that the police had reasonable suspicion to stop Hernandez, and were, therefore, justified in tackling him to prevent his continued flight, we hold that the trial court did not err in denying his motion to suppress the knife subsequently seized by the police.

The judgment is affirmed.

LOWENSTEIN and LAURA DENVIR STITH, JJ., concur.