Bobby GREENO, Appellant–Defendant,

v.

STATE of Indiana, Appellee–Plaintiff.

No. 49A04–0601–CR–28.

Court of Appeals of Indiana.

Feb. 27, 2007.

Steven D. Allen, Joseph M. Cleary, Hammerle Allen & Cleary, Indianapolis, IN, Attorneys for Appellant.

Steve Carter, Attorney General of Indiana, J.T. Whitehead, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

## OPINION

MAY, Judge.

Bobby Greeno appeals the denial of his motion to suppress the evidence collected from his person. In this interlocutory appeal, he asserts the warrantless search to which he was subjected was unconstitutional.[1] The Fourth Amendment permits a police officer, without any reasonable suspicion of any wrongdoing, to approach a citizen to ask questions; however, that citizen remains free to ignore the questions and walk away. Accordingly, when a citizen in such a circumstance walks away from the officer, the officer must have reasonable suspicion a crime is, was, or is about to occur prior to yelling "stop" and chasing the citizen. Because the officer had no reasonable suspicion when he yelled for Greeno to stop and then chased after Greeno, his warrantless search of Greeno was improper. We therefore reverse the denial of Greeno's motion to suppress.

### FACTS AND PROCEDURAL HISTORY

On August 7, 2004, Indianapolis Police Officer Mark Spears was dispatched to a business known as Contractors Plus because "apparently there was [an] anonymous female caller stating that a man by the name of John Gregory was at that location in possession and using the drug Oxycontin." (Tr. at 6.) As Officer Spears pulled into the Contractors Plus parking lot, he saw a man later identified as Greeno sitting outside on a roll of carpet.

When Greeno saw the police car, he stood up and walked quickly toward the building. From approximately twenty yards away, Officer Spears yelled for

---

1. At the end of his argument, Greeno asserts the "search of Greeno's person was unconstitutional and unreasonable and violated Greeno's rights under the Fourth Amendment to the United States Constitution and Art. One, Sec. 11 of the Indiana Constitution." (Br. of Appellant at 7.) However, Greeno provided no separate analysis explaining why the search violated the Indiana Constitution. Therefore, he waived any argument based on the Indiana Constitution, and we need only address the validity of the search under the Fourth Amendment. *See White v. State,* 772 N.E.2d 408, 411 (Ind.2002) (state constitutional argument waived where appellant provided only federal analysis).

Greeno to "stop because I just wanted to ask the man if he was John Gregory and that I was there on an investigation." (*Id.* at 8.) Greeno kept going, and Officer Spears "began a quick pace jog towards him." (*Id.* at 9.) Greeno entered the building through an open two-car garage door and went "to the back wall area of the business." (*Id.* at 11.)

Officer Spears initially could not enter the building because a Rottweiler was growling and barking at him. Officer Spears "hollered for [a woman he saw] to come and get the dog." (*Id.* at 10.) Officer Spears could "see [Greeno] and he was putting his, he had like bib overalls with a leather jacket and I could see him making a motion." (*Id.* at 11–12.) Greeno, who was wearing a leather jacket indicating membership in the "Son's [sic] of Silence motorcycle club gang" (*id.* at 12), had his back to Officer Spears and he was

> manipulating something, he's doing manipulations like this and his back is to me so I didn't know what, what he was doing with this, what I was thinking was he is either going to pull something out, he's either trying to hide something, there is something right here and it cause[d] me some concern uh for what he was doing.

(*Id.*)

When two other men entered the warehouse, Officer Spears became concerned for his safety. He decided not to walk over to Greeno, and instead he yelled for Greeno to come back to him. Greeno refused. Officer Spears approached Greeno, who was "very nervous panicky." (*Id.* at 13.) Officer Spears conducted a pat down of Greeno's bib overalls and felt "a hard object" that he thought could be "possibly a folding blade knife, it had the consisten-

cy of just a hard object, just consistent with possibly a knife." (*Id.* at 13–14.) Officer Spears retrieved the item from the overalls, and it was "a clear yellow unmarked pill bottle ... it had a number of pills and white substance in it." (*Id.* at 14.)

The State charged Greeno with possession of methamphetamine as a Class C felony[2] and two counts of possession of a controlled substance as Class D felonies.[3] Greeno filed a motion to suppress the drugs. After a hearing at which only Officer Spears testified, the court denied Greeno's motion. Greeno petitioned for reconsideration, which the court denied. The trial court certified the issue for interlocutory appeal, and we accepted jurisdiction.

## DISCUSSION AND DECISION

■ The Fourth Amendment to the United States Constitution protects citizens from unreasonable searches and seizures. U.S. Const. Amend. IV. The Fourteenth Amendment extended to state governments the Fourth Amendment's requirements for constitutionally valid searches and seizures. *Figert v. State*, 686 N.E.2d 827, 830 (Ind.1997). When a defendant challenges whether evidence was gathered properly under the Constitution, the State bears the burden of proving the evidence was admissible. *See Edwards v. State*, 759 N.E.2d 626, 630 (Ind.2001) (discussing admissibility under the Fourth Amendment of evidence gathered in warrantless search).

■ A police officer may stop a person to investigate possible criminal behavior without the probable cause required for a search warrant "if the officer has a reasonable and articulable suspicion that the person has been, is, or is about to be

---

**2.** Ind.Code § 35–48–4–6.

**3.** Ind.Code § 35–48–4–7.

engaged in criminal activity." *Wells v. State*, 772 N.E.2d 487, 489 (Ind.Ct.App. 2002) (citing *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)[4]). The "reasonable suspicion" requirement for a *Terry* stop is satisfied when

> the facts known to the officer, together with the reasonable inferences arising from such facts, would cause an ordinarily prudent person to believe that criminal activity has occurred or is about to occur. Reasonable suspicion entails something more than an inchoate and unparticularized suspicion or hunch, but considerably something less than proof of wrongdoing by a preponderance of the evidence.

*Id.* at 489–90 (quoting *Crabtree v. State*, 762 N.E.2d 241, 246 (Ind.Ct.App.2002)). Reasonable suspicion is determined under the totality of the circumstances. *Lampkins v. State*, 682 N.E.2d 1268, 1271 (Ind. 1997), *modified on other grounds on reh'g* 685 N.E.2d 698 (Ind.1997). If the facts known by the police at the time of the investigatory stop are such that a person of reasonable caution would believe the action taken was appropriate, the command of the Fourth Amendment is satisfied. *Id.*

4. The State asserts the stop of Greeno was justified because the facts herein are similar to the facts in *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). In *Terry*, an officer in plain clothes was patrolling for pickpockets and shoplifters on the streets of downtown Cleveland at 2:30 one afternoon when he noticed two men, Terry and Chilton, standing on a street corner. One of the men stood at the corner while the other walked past some stores, paused to look in a store window, walked a little further, turned around to go back to the original corner, and paused to look in the same store window on the way. When he returned to the corner, the two men conferred, and then the second man walked the same route the first had, stopping twice to look in the same store window. The two men repeated this activity five or six times, for in total nearly a dozen trips down

### 1. Was the Fourth Amendment Implicated?

Prior to addressing whether reasonable suspicion existed for a *Terry* stop, we must determine whether a *Terry* stop occurred. The State claims the "initial encounter between [Officer] Spears and [Greeno] did not implicate the Fourth Amendment...." (Appellee's Br. at 5.) The State characterizes as the "initial encounter" Officer Spears' arrival at the parking lot and his "ask[ing] Defendant to stop so that he could continue to investigate his response to the call." (*Id.* at 13.) According to the State, "[t]his was reasonable police activity that did not amount to a *Terry* stop requiring as yet any reasonable suspicion of criminal activity." (*Id.*) (emphasis added).

To support its argument, the State cites *Overstreet v. State*, 724 N.E.2d 661 (Ind. Ct.App.2000), *trans. denied* 741 N.E.2d 1251 (Ind.2000). The facts therein were:

> At approximately 5:55 a.m. on November 4, 1997, Lieutenant Melvin E. Paris of the Mooresville Police Department observed Overstreet looking into a mailbox and then closing the mailbox door.

the street. Based on his experience, the officer believed the men were "casing a job, a stick-up." *Id.* at 6, 88 S.Ct. 1868. The officer approached the men and asked for their names. When the men mumbled in response, he patted down the outside of Terry's clothing and felt a gun. The pat-down also revealed a handgun on Chilton.

Aside from the fact that Terry and Greeno were both walking before an officer approached each defendant and asked his name, this case is not factually similar to *Terry*. Greeno was doing nothing to suggest potential criminal activity. He was sitting on a roll of carpet in a parking lot, while Terry and his companion had been "casing" a store for a robbery. Accordingly, we decline the State's invitation to find this search reasonable by way of analogy to *Terry*.

Overstreet then walked hurriedly toward a parked vehicle and drove away. Lieutenant Paris, who was familiar with newspaper carriers and their vehicles, did not recognize Overstreet or his vehicle. Overstreet drove a short distance before stopping at a Crystal Flash gas station. Lieutenant Paris watched as Overstreet exited his car and began to pump air into one of his automobile tires with an air hose. Lieutenant Paris pulled his marked police vehicle into the gas station behind Overstreet's vehicle. The flashing lights were not activated on the police vehicle. Lieutenant Paris got out of his vehicle, walked up to Overstreet, asked Overstreet what he had been doing at the mailbox and also asked him for identification. Overstreet volunteered that his operator's license was suspended.

*Id.* at 662–63. In response to Overstreet's allegation that interaction amounted to an investigatory stop implicating the Fourth Amendment, we held:

> The relevant facts are undisputed. The record shows that Paris did not stop Overstreet's vehicle. Overstreet had already stopped his vehicle at a gas station. Neither did Paris stop Overstreet himself. When Paris approached him, Overstreet was using an air hose to pump air into one of his automobile tires. Overstreet was not detained. Paris did not restrict his movement in any way. Paris merely asked Overstreet about his actions at the mailbox and asked him for identification. Overstreet then volunteered that his operator's license was suspended.

> We decline to hold that this brief encounter and inquiry constitutes a *Terry* stop which required a reasonable suspicion of criminal activity. Not every encounter between a police officer and a citizen amounts to a seizure requiring objective justification. To characterize every street encounter between a citizen and the police as a seizure, while not enhancing any interest guaranteed by the Fourth Amendment, would impose wholly unrealistic restrictions upon a wide variety of legitimate law enforcement practices. *See United States v. Mendenhall*, 446 U.S. 544, 554, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980). Indeed, it is not the purpose of the Fourth Amendment to eliminate all contact between police and the citizenry. *Id.* at 553, 446 U.S. 544, 100 S.Ct. 1870, 64 L.Ed.2d 497.

> As long as the person to whom questions are put remains free to disregard the questions and walk away, there has been no intrusion upon that person's liberty or privacy to require some particularized and objective justification. *Id.* at 554, 100 S.Ct. 1870,. Examples of circumstances under which a reasonable person would have believed he was not free to leave include the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled. *Id.* "In the absence of some such evidence, otherwise inoffensive contact between a member of the public and the police cannot, as a matter of law, amount to a seizure of that person." *Id.* at 555, 446 U.S. 544, 100 S.Ct. 1870, 64 L.Ed.2d 497. In this case, there was no such evidence presented. The trial court properly denied Overstreet's motion to suppress.

*Id.* at 663–64.

If Greeno had remained seated on the roll of carpet and if, upon Officer Spears' inquiry about the presence of John Gregory, Greeno had announced he had methamphetamine in his pocket, this case might be analogous to *Overstreet*. However, Greeno

walked away before Officer Spears was able to speak to him.

The first interaction between them was when, from approximately twenty yards away, Officer Spears yelled for Greeno to "stop." (Tr. at 8.) When Greeno did not stop, Officer Spears began chasing him. In *Overstreet,* we stressed that the officer stopped neither Overstreet nor his car. Rather, the officer walked up to Overstreet and asked a question while Overstreet remained "free to disregard the question and walk away." *Overstreet,* 724 N.E.2d at 664. When Officer Spears began chasing Greeno, Greeno obviously was no longer "free to ... walk away." *Id.* Therefore, contrary to the State's assertion, when Officer Spears yelled stop and began chasing Greeno, the Fourth Amendment was implicated.

### 2. *Was the Stop Proper?*

 Because the Fourth Amendment was implicated, Officer Spears needed a reasonable and articulable suspicion that Greeno was, had been, or was about to be engaged in criminal activity before he could stop Greeno. *See Wells,* 772 N.E.2d at 489. We must determine whether, based on the totality of the circumstances known to Officer Spears, a person of reasonable caution would believe Officer Spears' actions were appropriate. *See Lampkins,* 682 N.E.2d at 1271.

When Officer Spears arrived at the parking lot of Contractors Plus, he did not have reasonable suspicion to detain anyone. Officer Spears had not seen Greeno commit a felony or misdemeanor. (Tr. at 20.) The report Officer Spears received came from an anonymous caller. For an anonymous tip to give rise to reasonable suspicion, the tip must contain facts not "easily obtainable by the general public" such that the police may verify the tip's credibility and it must "demonstrate an intimate familiarity with the suspect's affairs and be able to predict future behavior." *Sellmer v. State,* 842 N.E.2d 358, 361 (Ind.2006). The tip herein—that "John Gregory" would be at Contractors Plus and that he possessed and used Oxycontin—contained no indicia of reliability or credibility. *See id.* at 362 (holding anonymous tip was insufficiently detailed to give rise to reasonable suspicion).

Moreover, the report Officer Spears received—that Gregory possessed and used Oxycontin—did not necessarily reflect illegal activity. Oxycontin is a prescription pain medicine, and Gregory could have been using it legally with a valid prescription.[5] *See* http://www.accessdata. fda.gov/scripts/cder/drugsat fda/index.cfm?fuseaction=Search.Overview & DrugName=OXYCONTIN (last visited October 22, 2006). Therefore, the tip did not provide reason to believe "illegal activity was afoot." *See Sellmer,* 842 N.E.2d at 362. *See also Florida v. J.L.,* 529 U.S. 266, 272, 120 S.Ct. 1375, 146 L.Ed.2d 254 (2000) (reasonable suspicion "requires that a tip be reliable in its assertion of illegality, not just in its tendency to identify a determinate person").

 Nor does Greeno's walking away when he saw Officer Spears pull into the parking lot give rise to a reasonable suspicion of criminal activity. Citizens are not required to interact with police officers. *See Illinois v. Wardlow,* 528 U.S. 119, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000).[6] Ac-

---

**5.** Clearly, "diversion and abuse" of Oxycontin are problems in this country. *See, e.g.,* http://www.deadiversion.usdo j.gov/pubs/brochures/alert_oxycontin/alert_oxy.htm (last visited January 10, 2007). Nevertheless, Officer Spears' testimony did not indicate the caller said Gregory was using the drug illegally.

**6.** There, the Court explained:

cordingly, we decline the State's invitation to hold that walking away upon seeing the police arrive, without more, justifies a *Terry* stop. *See Carter v. State*, 692 N.E.2d 464, 467 (Ind.Ct.App.1997) (holding defendant leaving restaurant and walking to his car after arrival of plain clothes police officers did not provide reasonable suspicion for stop because officer's testimony did not demonstrate defendant was "attempting to avoid the police").

At the hearing, Officer Spears asserted his justification for searching Greeno was officer safety. However, we have explained:

> Officer safety is always a legitimate concern, but standing alone officer safety cannot form the basis for a valid investigatory stop. *See Webb v. State*, 714 N.E.2d 787, 788 (Ind.Ct.App.1999) (reasonable suspicion not established when defendant who turned away from officer and placed his hands down the front of his pants was subjected to search for officer safety); *Terry*, 392 U.S. at 32–33, 88 S.Ct. 1868, 20 L.Ed.2d 889 (Harlan, J., concurring) ("[I]f the frisk is justified in order to protect the officer during an encounter with a citizen, the officer must first have constitutional grounds to insist on an encounter, to make a forcible stop. Any person, including a policeman, is at liberty to avoid a person he considers dangerous."); *United States v. Burton*, 228 F.3d 524, 528 (4th Cir.2000) ("Before [officer] was entitled to allay his safety

concerns and conduct a protective search, he had to be presented with objective facts that would justify an investigatory *Terry* stop—a reasonable suspicion that a crime had been committed or that criminal activity was taking place."). In sum, a lawful stop, based on objective facts and reasonable suspicion, is the predicate for a pat down.

Again, to stop an individual for investigatory purposes, the officer must first have reasonable suspicion supported by articulable facts that criminal activity "may be afoot." *Terry*, 392 U.S. at 30, 88 S.Ct. 1868, 20 L.Ed.2d 889. While we do not doubt that [the officer] was concerned for his safety, that concern, standing alone, does not satisfy the reasonable suspicion requirement first outlined in *Terry*. That requirement is met where the facts known to the officer at the moment of the stop, together with the reasonable inferences arising from such facts, would cause an ordinarily prudent person to believe criminal activity has occurred or is about to occur. *Moultry*, 808 N.E.2d at 170.

*State v. Atkins*, 834 N.E.2d 1028, 1033 (Ind.Ct.App.2005), *trans. denied* 841 N.E.2d 192 (Ind.2005). Therefore, while officer safety might have justified the search of Greeno once he was legally stopped, it cannot justify Officer Spears' chase to stop him without reasonable suspicion of illegal activity.

In *Florida v. Royer*, 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983)., [we] held that when an officer, without reasonable suspicion or probable cause, approaches an individual, the individual has a right to ignore the police and go about his business. [*Id.*] And any "refusal to cooperate, without more, does not furnish the minimal level of objective justification needed for a detention or seizure." *Florida v. Bostick*, 501 U.S. 429, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991) .... But unprovoked flight is simply not a mere refusal to cooperate. Flight, by its very nature, is not "going about one's business"; in fact, it is just the opposite. Allowing officers confronted with such flight to stop the fugitive and investigate further is quite consistent with the individual's right to go about his business or to stay put and remain silent in the face of police questioning.

*Illinois v. Wardlow*, 528 U.S. at 125, 120 S.Ct. 673 (internal citations omitted).

We find Greeno's circumstances similar to *Dowdell v. State*, 747 N.E.2d 564 (Ind. Ct.App.2001), *trans. denied* 761 N.E.2d 412 (Ind.2001):

> Indianapolis Police Officer Scott David Teagardin was on patrol when he saw Dowdell standing on the sidewalk smoking what appeared to be a [marijuana] "blunt." Officer Teagardin admitted he was uncertain whether Dowdell was smoking a blunt or a cigar. At the time of this sighting, Officer Teagardin was in a marked police vehicle driving about ten to fifteen feet away from Dowdell. Officer Teagardin stopped his vehicle and said something along the lines of "hey come here" or "what are you doing?" to Dowdell.
>
> At this point, Dowdell threw his "blunt" down and walked quickly over to Officer Teagardin's vehicle. Dowdell had what looked like plastic baggies in one hand and he immediately put both hands in his pockets. Officer Teagardin exited his vehicle and noticed a strong odor of marijuana on Dowdell. He then handcuffed Dowdell and began to question him concerning the plastic baggies.

*Id.* at 565 (footnote and citation omitted). The State argued in *Dowdell* that we should follow *Overstreet* and hold no reasonable suspicion was required for this interaction. We declined to do so.

> The U.S. Supreme Court has given examples of circumstances under which a reasonable person would believe he was not free to leave. These include the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person or the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled. Here, there is evidence indicating compliance was compelled. Officer Teagardin was in a marked police vehicle when he pulled up to about ten or fifteen feet from Dowdell, who was standing on the sidewalk, and said to him "hey, come over here" or "what are you doing?" Also, unlike *Overstreet* where the defendant stopped at a gas station of his own free will and the officer approached him, Dowdell was standing on the sidewalk when Officer Teagardin called him over to his vehicle. A reasonable person when faced with a police officer pulling up to him in a marked vehicle and calling for him to come over to the car would not assume that he can just turn and walk away. Therefore, Officer Teagardin's encounter with Dowdell constituted a stop and thus required reasonable suspicion.
>
> Because the blunt and the plastic baggies were discovered as the result of an illegal stop, we reverse the trial court and vacate Dowdell's convictions.

*Id.* at 567 (internal citation omitted).

Based on *Dowdell,* we hold the Fourth Amendment prohibited Officer Spears, without reasonable suspicion, from requesting that Greeno stop and from chasing after him. Because the stop was improper, the evidence collected must be suppressed. Therefore, we reverse the denial of Greeno's motion to suppress the evidence collected from his person pursuant to the illegal stop by Officer Spears. *See id.*

Reversed.

KIRSCH, C.J., and BAKER, J., concur.