**Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



**FILED**

Dec 20 2012, 9:26 am

**CLERK**
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**ROBERT D. KING, JR.**
The Law Office of Robert D. King, Jr., P.C.
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**JODI KATHRYN STEIN**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| JEFFREY HIGGENBOTTOM, | ) | |
| | ) | |
| Appellant-Defendant, | ) | |
| | ) | |
| vs. | ) | No. 49A05-1203-CR-108 |
| | ) | |
| STATE OF INDIANA, | ) | |
| | ) | |
| Appellee-Plaintiff. | ) | |

APPEAL FROM THE MARION SUPERIOR COURT
The Honorable Justin H. Hunter, Special Judge
Cause No. 49G03-1105-FC-30438

**DECEMBER 20, 2012**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**SHEPARD, Senior Judge**

The trial court found Jeffrey Higgenbottom guilty of burglary and of being a habitual offender and sentenced him to fourteen years. We affirm.

FACTS AND PROCEDURAL HISTORY

Around 3:30 a.m. on April 30, 2011, Officer Larry Lanigan of the Indianapolis Metropolitan Police Department was dispatched to investigate a report of a suspicious vehicle. The neighbor who made the call reported seeing a stocky man leave the truck and walk through the yard of the house next door. After surveying the scene for a few moments, Lanigan saw a man walk out from between two homes and head up the sidewalk. Lanigan ordered the man to stop several times. As he finally did stop and Lanigan approached, the officer saw that the man (subsequently identified as Higgenbottom) was carrying a flashlight and had a screwdriver, vise grips, and a pipe cutter sticking out of his pants pockets.

Higgenbottom said he lived in the neighborhood and was taking a walk, but he declined to give Lanigan his name and address. Lanigan told Higgenbottom to lie on the ground and handcuffed him.

Lanigan next followed Higgenbottom's tracks back through the dew-covered grass; they led to a snow blower that was sitting in a yard. He followed the snow blower's tracks back to an open shed. A pressure washer, a lawn mower, a chain saw, and other items had been removed from the shed and placed on the ground. The police later found that Higgenbottom had on his person a garden hose nozzle that belonged to the shed's owners. Subsequently, Higgenbottom gave a statement to the police admitting that he had removed the items from the shed without the owners' permission.

2

The State charged Higgenbottom with burglary, theft, and being a habitual offender. Higgenbottom moved to suppress all evidence discovered as a result of being stopped by Lanigan. The trial court denied his motion after a hearing.

After a trial to the bench, the court found Higgenbottom guilty of burglary and theft and subsequently found that he was a habitual offender. Declining to enter a judgment of conviction for theft, citing double jeopardy concerns, the court sentenced Higgenbottom to fourteen years on the burglary and the habitual enhancement. This appeal followed.

## ISSUES

Higgenbottom raises two evidentiary issues:

I.      Whether the trial court erred by admitting evidence discovered after Lanigan detained Higgenbottom, and

II.     Whether the court abused its discretion by admitting testimony from a fingerprint analyst during the habitual offender phase of the trial.

## DISCUSSION AND DECISION

### I. Admission of Evidence Obtained Through a *Terry* Stop

Higgenbottom says that Lanigan did not have any reason to detain him, and the stop violated his protection against unreasonable search and seizure under the Fourth Amendment.[1] Thus, Higgenbottom reasons, any evidence obtained as a result of the stop must be suppressed, and his burglary conviction reversed.

The Supreme Court has held that the Fourth Amendment bars an officer from detaining an individual for investigation unless the facts available to the officer at the

---

[1] Higgenbottom does not challenge the stop under the Indiana Constitution.

3

moment of the seizure would warrant a person of reasonable caution in the belief that the individual has been, or is about to be, engaged in criminal activity. *Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968). As Chief Justice Warren wrote for a unanimous Court, in determining whether an officer acted reasonably, consideration must be given not to unparticularized suspicion but rather to "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Id.*

A seizure does not occur for Fourth Amendment purposes when an officer commands a person to stop. *See California v. Hodari D.*, 499 U.S. 621, 111 S. Ct. 1547, 113 L. Ed. 2d 690 (1991) (officer's order to halt was not a seizure because Hodari fled instead of complying with the order). Rather, a seizure requires either the use of physical force by the police upon a person or, absent force, the person's submission to police authority. *Id.* at 1551. We review trial court determinations of reasonable suspicion de novo. *Bannister v. State*, 904 N.E.2d 1254 (Ind. 2009).

In this case, Lanigan twice shouted at Higgenbottom to halt, but Higgenbottom kept walking. Higgenbottom finally stopped when Lanigan ran up to him and told him to stop a third time. Under the rule of *Hodari D.*, Higgenbottom was seized at the point when he stopped walking. Therefore, we must consider all facts known to Lanigan at that point to determine whether the seizure was reasonable.

Lanigan was dispatched to the scene in the early morning hours based on a report of a suspicious vehicle. Upon arrival, Lanigan saw a truck parked on the street and checked its license plate in his computer. Lanigan learned that the plate was registered to

4

a different truck. He also saw a catalytic converter in the back of the truck, and he knew that converters are "hot ticket item[s]" for theft due to their scrap value. Tr. p. 29. Lanigan had patrolled that neighborhood for twenty-three years, and it was unusual to see a vehicle parked on the street because all of the homes have long driveways.

Next, Lanigan talked with Forrest Robinson, the neighbor who had made the initial call. Robinson told Lanigan the following: Robinson had been awakened by the sound of a vehicle door closing, and when he went to a window, he saw a stocky person walking down his neighbor's driveway toward a truck. Robinson could not determine the person's race, but he could tell the person was probably male and was not his neighbor. The truck was blocking Robinson's driveway, which was unusual. Next, Robinson saw the person walk away from the truck carrying something like a toolbox. The person walked into Robinson's neighbor's yard and around the side of the neighbor's house. It appeared to Robinson that the person was attempting to avoid walking under a streetlight. Next, Robinson went outside and examined the truck. He determined it did not belong to any of his neighbors and called the police.

Upon receiving this information, Officer Lanigan returned to his squad car and sat there with the lights off to see if the person returned to the truck. After a few minutes, Lanigan got out and walked around Robinson's neighbor's house. As he walked back toward the street, Lanigan saw Higgenbottom on the other side of the street, walking toward the street in a yard between two houses. Higgenbottom did not obey Lanigan's first two orders to stop, so Lanigan ran up to him. As Lanigan approached Higgenbottom, he saw that Higgenbottom was carrying a flashlight and had a

5

screwdriver, vise grips, and a pipe cutter sticking out of his pockets.[2] Lanigan knew that pipe cutters can be used to remove catalytic converters from vehicles.

Considering these facts and the reasonable inferences drawn from them, we conclude that a person of reasonable caution would have been warranted in believing, under the totality of the circumstances, that Lanigan's seizure of Higgenbottom was appropriate to investigate whether Higgenbottom had committed an offense or was about to commit an offense in the neighborhood.

Higgenbottom cites *Greeno v. State*, 861 N.E.2d 1232 (Ind. Ct. App. 2007), to support his claim. There, an officer, acting on an anonymous tip, sought to investigate whether a person was using Oxycontin, but the person, Greeno, walked away from the officer. The officer followed Greeno into a building, patted him down, and discovered illegal drugs. A panel of this Court concluded that the officer lacked reasonable suspicion to detain Greeno because using Oxycontin is not necessarily a criminal act, and Greeno had the right to walk away from the officer. Here, Lanigan received information from an identified source, saw a truck bearing an incorrect plate that did not belong in the neighborhood, saw a catalytic converter in the back of the truck, and saw Higgenbottom walking through people's yards in the middle of the night with tools in his pockets. This case presents much stronger facts than *Greeno*.

---

[2] Lanigan said at the hearing on Higgenbottom's motion to suppress that he did not see the tools until after he told Higgenbottom to stop for a third time and Higgenbottom had stopped. The evidence from the hearing was incorporated into the evidence presented at trial. However, Lanigan also testified at trial that he saw the tools in Higgenbottom's pockets as he ran up to Higgenbottom, before Higgenbottom had stopped. We consider the facts in the light most favorable to the judgment. *Reaves v. State*, 586 N.E.2d 847 (Ind. 1992).

We conclude that Lanigan's seizure of Higgenbottom did not violate the Fourth Amendment.

## II. Admission of Fingerprint Evidence

The trial court exercises discretion over admission of evidence, and we review its decisions only for an abuse of that discretion. *Jones v. State*, 780 N.E.2d 373 (Ind. 2002). A reviewing court considers the evidence in favor of the trial court's ruling and unrefuted evidence in the defendant's favor. *Reaves*, 586 N.E.2d at 857.

Higgenbottom argues that the trial court should not have admitted testimony from State's witness Joseph Johnson, a fingerprint analyst, during the habitual offender phase. He says the State failed to establish that Johnson qualified as an expert witness.[3] Without Johnson's testimony, Higgenbottom says, there is insufficient evidence to sustain the habitual offender determination. This claim turns on Indiana Rule of Evidence 702, which provides in relevant part:

> (a)    If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

Johnson testified that he had worked for the IMPD and a predecessor agency for over eighteen years as a fingerprint analyst and record keeper. He had testified about fingerprint analysis in one hundred and fifty cases and had conducted "[t]housands upon

---

[3] Higgenbottom also says that the State failed to prove that the scientific principles of fingerprint analysis are sufficiently reliable. However, Higgenbottom did not challenge the scientific principles of fingerprint analysis at any point during the trial court proceedings, so the question is not preserved for appeal. *See Jones v. State*, 957 N.E.2d 1033 (Ind. Ct. App. 2011) (Jones' claim waived because it was presented for the first time on appeal).

thousands" of fingerprint comparisons. Tr. p. 120. His original training in 1993 was a two-week fingerprint classification course. This evidence was sufficient to establish that Johnson had sufficient knowledge, skill, or experience to provide an expert opinion on fingerprint analysis. *See, e.g.*, *White v. State*, 547 N.E.2d 831 (Ind. 1989) (fingerprint analyst qualified as an expert witness because she had performed hundreds of fingerprint classifications and had testified in court on two prior occasions). Higgenbottom says Johnson's lack of training after his initial course in 1993 renders him unfit as an expert witness, but lack of extensive formal training goes to the weight of the expert testimony rather than to its admissibility. *Id.* The trial court did not abuse its discretion by admitting Johnson's testimony.

## CONCLUSION

Affirmed.

NAJAM, J., and VAIDIK, J., concur.