IN THE DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
FIFTH DISTRICT

NOT FINAL UNTIL TIME EXPIRES TO
FILE MOTION FOR REHEARING AND
DISPOSITION THEREOF IF FILED

STATE OF FLORIDA,

      Appellant,

v.                                                          Case No. 5D15-877

JAMES H. WATSON,

      Appellee.

_____/

Opinion filed March 11, 2016

Appeal from the Circuit Court
for Orange County,
Timothy R. Shea, Judge.

Pamela Jo Bondi, Attorney General,
Tallahassee, and Kaylee D. Tatman,
Assistant Attorney General, Daytona
Beach, for Appellant.

James S. Purdy, Public Defender, and
Nicole J. Martingano and Christopher S.
Quarles, Assistant Public Defenders,
Daytona Beach, for Appellee.


PALMER, J.

      The State of Florida appeals the order entered by the trial court granting James

Watson's motion to suppress cocaine discovered at the time of his arrest. Determining

that the police had reasonable suspicion to detain Watson, and that Watson abandoned

the contraband in question, we reverse.

The State charged Watson with possession of cocaine in violation of section 893.13(6)(a), Florida Statutes (2014). Watson filed a pre-trial suppression motion, seeking to suppress "any and all evidence tangible or intangible, which was discovered, observed, or otherwise gained after the detention of the defendant." At the suppression hearing, the State presented evidence indicating that, at the time of Watson's arrest, the Orange County Sheriff's Office was conducting a directed patrol in a high crime area. Deputy Gunn, with seven years of service with the Orange County Sheriff's Office, surveilled a Kwik Stop and relayed his observations to the other officers on the directed patrol, including Sergeant Barrett, the arresting officer. Deputy Gunn testified:

> [At approximately 1:30 A.M.], [w]hile conducting surveillance, I witnessed Mr. Watson exit a taxi on [sic] the parking lot of the Kwik Stop with another Hispanic male. I witnessed Mr. Watson walk to a known individual, who I know to -- to have participated in illegal sales of narcotics in the past. I witnessed a transaction where Mr. Watson handed U.S. currency; the known drug dealer retrieved an object from his mouth and placed it in Mr. Watson's mouth. And I relayed that [information to the other officers involved in the directed patrol].

Deputy Gunn explained the significance of the mouth-to-mouth transaction:

> [I]t's common use of a -- a person who conducts himself in illicit drug sales to keep the crack cocaine into their mouth to prevent detection from law enforcement. What we've come across is -- and it's a test that they do to where they retrieve it out of their mouth. Typically, they just put it in their hand or, if they want to test you, if they don't know you, they will take it and they will try to place it into your mouth. Obviously, if you don't take it into your mouth, you could be law enforcement.
> In this case, the defendant did retrieve it into his mouth. That's the -- that's the transaction I witnessed.

Deputy Gunn further testified as to his observations of Watson:

> [Watson] was talking to the -- another Hispanic male at the time, handing him money. That Hispanic male walked -- walked into the convenience store, came back out with what I noticed to be brillo – copper brillo, and handed it to [Watson].
>
> . . . .
>
> We didn't take him down right away, but [Watson] began to, from my observations, load a crack pipe with the brillo. I relayed the information that I believed that [Watson] was going to smoke the crack cocaine he just purchased right then and there.
>
> At that time -- that's when the sergeant pulled in and Mr. Watson . . . walked -- started beginning to walk away. As he walked away, I witnessed him throw an object to the ground. I relayed that also on the radio, and then I left my post at that time.

Sergeant Barrett, an 18-year veteran of the Orange County Sheriff's Office, testified that he had made hundreds of drug-related arrests in this area. He further testified concerning his observations of Watson:

> Gunn advised me that he had someone that had just purchased what we believed to be crack cocaine. . . . I saw [Watson] standing there at the corner, along with two to three other black males. As soon as I turned on the corner -- they know my unmarked Explorer -- they immediately started walk -- walking in separate directions.
>
> . . . .
>
> [Watson] began walking to the north through the parking lot. As I pulled in, I saw that his right hand was closed into a fist. As I started to pull up next to him, out my passenger window I saw him drop two objects to the ground.
>
> . . . .
>
> I immediately got out, stopped him, asked him for his ID. He handed me his -- his driver's license. As soon as he handed me his driver's license, I walked right over to the area where I saw him drop the items and picked up a piece of brillo and a small, little plastic bag with three pieces of what I suspected to be crack cocaine inside of it.
>
> . . . .
>
> After I recovered those items, I placed him under arrest, conducted a field presumptive test on the crack cocaine, which came back positive, and he was transported to jail.

3

At the conclusion of the hearing, the trial court granted the suppression motion.

We have articulated the standard of review applicable to a trial court's ruling on a motion to suppress:

> A trial court's ruling on a motion to suppress is clothed with a presumption of correctness, and a reviewing court must interpret the evidence and reasonable inferences and deductions that may be drawn from it in the manner most favorable to sustaining the ruling. While the test to be applied to factual findings of the trial court in this regard is whether competent, substantial evidence supports those findings, the trial court's application of the law to the facts is reviewed *de novo.*

Pritchard v. State, 987 So. 2d 204, 205 (Fla. 5th DCA 2008) (citations omitted).

The State argues that the trial court erred in granting Watson's suppression motion because, based on the fellow officer rule, reasonable suspicion existed to stop Watson. We agree.

In Bowers v. State, the Second District observed:

> The fellow officer rule provides a mechanism by which officers can rely on their collective knowledge to act in the field. Under this rule, the collective knowledge of officers investigating a crime is imputed to each officer and one officer may rely on the knowledge and information possessed by another officer to establish probable cause.

23 So. 3d 767, 769 (Fla. 2d DCA 2009), approved, 87 So. 3d 704 (Fla. 2012). Thus, by operation of the fellow officer rule, if Deputy Gunn had reasonable suspicion to detain Watson, so did Sergeant Barrett.

In Wallace v. State, 8 So. 3d 492 (Fla. 5th DCA 2009), we held that the police had reasonable suspicion to detain the defendant based on the following facts:

> On a Friday evening in 2007, a team of officers from the Brevard County Sheriff's Office was conducting a storefront operation at a 7–Eleven in Cocoa, Florida. The area in which

4

the 7-Eleven is located was "generally known as high crimes, high drug traffic area." One of the officers, Sgt. Molyneaux, a sixteen-year veteran officer, was in plain clothes in an undercover truck parked in 7–Eleven's parking lot looking for criminal activity, including drug sales.

At about 9:30 p.m., Sgt. Molyneaux saw Appellant drive into the 7–Eleven parking lot and park on the side of the building away from the general store traffic, although there were spaces available in front of the store. He concluded that Appellant looked "very nervous" because "[h]is eyes were very wide, and he was looking around a lot ... like he was looking for somebody." While Appellant was in the store, he continued to look out toward the parking lot as if he was looking for somebody. Minutes after Appellant entered the store, a white Buick entered the parking lot quickly and abruptly stopped next to Appellant's vehicle. Appellant exited the store, immediately walked over to the Buick and opened the passenger's side door. The Buick's driver handed something to Appellant, who in turn handed something to the driver and shut the door. The Buick then sped off. Sgt. Molyneaux saw Appellant put something in his left front pocket then get into his vehicle and drive off.

Sgt. Molyneaux was approximately forty feet from the transaction with a clear view, but did not see what Appellant and the Buick's driver were handing each other. Nonetheless, based on his training and experience, he believed that he had witnessed a drug transaction and called for police units to stop Appellant and the Buick. After being advised by Sgt. Molyneaux of his observations, Deputy Forrest stopped Appellant's vehicle before it left the 7–Eleven parking lot. When Appellant stepped out of the vehicle, Deputy Forrest saw a small bag of cocaine in plain view, seized it and arrested Appellant.

Id. at 493. The facts of this case are similar to those in Wallace and, thus, support reversal of the suppression order.

Like the 7-Eleven in Wallace, the Kwik Stop here was located in a high crime area, and Sergeant Barrett had made hundreds of arrests in this area for drug-related offenses. See Illinois v. Wardlow, 528 U.S. 119, 124 (2000) ("[T]he fact that the stop occurred in a 'high crime area' [is] among the relevant contextual considerations in

Terry [v. Ohio, 392 U.S. 1, 4 (1968)] analysis."). Also, as in Wallace, the officers here, with over twenty-five years of police service combined, had a great deal of experience. See Ornelas v. United States, 517 U.S. 690, 699-700 (1996) ("[A] police officer views the facts through the lens of his police experience and expertise. . . . [O]ur cases have recognized that a police officer may draw inferences based on his own experience in deciding whether probable cause exists."). Additionally, like the events in Wallace, the events here transpired at night. See Price v. State, 120 So. 3d 198, 202 (Fla. 5th DCA 2013) ("The time of the alleged offense was in the morning hours on a weekday (Thursday) and in daylight as opposed to the darkness of night.").

We further agree with the State that the trial court erred in granting the suppression motion because the evidence demonstrated that Watson abandoned the cocaine before Sergeant Barrett detained him. Sergeant Barrett's uncontradicted testimony established that he observed Watson drop the cocaine before he was detained. See California v. Hodari D., 499 U.S. 621, 629 (1991) (holding that suppression was not appropriate where the defendant dropped a rock of crack cocaine before he was seized because the "abandoned [cocaine] was . . . not the fruit of a seizure").

Accordingly, we reverse the suppression order and remand for further proceedings consistent with this opinion.

REVERSED AND REMANDED.

SAWAYA and TORPY, JJ., concur.